433 So.2d 911 (1983)
WILLIAM ISELIN AND COMPANY, INC.
v.
DELTA AUCTION AND REAL ESTATE COMPANY, et al.
No. 54052.
Supreme Court of Mississippi.
April 27, 1983.
Rehearing Denied July 13, 1983.
Brown, Tillman & Rutherford, Winn Davis Brown, Jr., Southaven, James E. Irion, Memphis, Tenn., for appellant.
Gene Barton, Mitchell, Eskridge, Voge, Clayton & Beasley, William M. Beasley, Scribner & Brewer, William H. Brewer, Max E. Warren, Jr., Tupelo, Bennett, Lotterhos & Sulser, Richard T. Bennett, Marcus M. Wilson, Jackson, for appellee.
Before BROOM, PRATHER and ROBERTSON, JJ.
PRATHER, Justice, for the Court:
Delta Auction and Real Estate Company interpled $40,039.83 in the Chancery Court of Lee County for division among the creditors of Moran Manufacturing. Among the eighteen creditors filing claims against the fund, three creditors asserted preferred status. Following the hearing, the chancellor rendered an opinion in which he ruled that all of the creditors were general unsecured creditors, and that each creditor was entitled *912 to receive a pro rata share of the entire fund. Afterwards, William Iselin and Company, Inc., one of the creditors claiming a right to priority, attempted to file an amended proof of claim which changed its claim from a secured amount of $19,338.00 to a general claim of $101,568.77. The amendment was denied.
On appeal, William Iselin and Company contends that it was error for the chancellor to deny its amendment. In addition, Tupelo Foam Sales Company, Inc. and Peak Sales, Inc. contend on their cross-appeal that the chancellor erred in not awarding them priority claims based on judgment liens obtained against Moran.

FACTS
Moran Manufacturing Company, Inc., (Moran) a Mississippi corporation, was engaged in making furniture in Tupelo. One of the companies doing business with Moran was William Iselin and Company, Inc. (Iselin). They entered into a "factoring" contract by which Iselin undertook to finance Moran's accounts receivable. After a period of operation, Moran ran into financial difficulties and entered into another contract with Delta Auction and Real Estate Company, Inc., (Delta) a Tennessee corporation, to conduct a bulk sale to liquidate Moran's assets.
Prior to the sale by Delta, all of Moran's creditors were notified of the proposed sale and of the proposed division of the receipts upon a pro rata basis.[1] No objection from any creditors was raised prior to the sale and no issue regarding the conduct of the sale was later made.
On December 6, 1979, Delta sold the items at an auction sale and received approximately $47,509.41. The proceeds were then removed and deposited in a Memphis bank, where they remained until brought to the Lee County Chancery Court. After Delta subtracted an amount for its sales commission, the total amount interpleaded from the auction sale was $40,039.83. Other deposits plus interest raised the total amount of $62,484.59 as of July 31, 1981 to be divided among Moran's creditors.
It was not until after the sale that disputes arose among the creditors. In February of 1980, default judgments were entered against Moran by three different creditors  Coleman Lumber in the approximate sum of $6,300.00, Tupelo Foam Sales, Inc., in the approximate sum of $39,900.00, and Peak Textiles in the approximate sum of $15,800.00. All judgments were duly enrolled in Lee County. Tupelo Sales' judgment was enrolled in the Lee County judgment roll on March 13, 1980, while Peak Textiles' default judgment was enrolled on March 14, 1980.
The evidence presented at the hearing established that the total debt claimed by all eighteen creditors was in the amount of $256,433.80. After a deduction for Delta's attorney fees and other expenses, each claimant was then awarded a general claim against the $61,013.60 remaining to be divided in pro rata shares.

LAW

I.
The first assignment of error asserts that the court erred in not allowing William Iselin and Company to amend its proof of claim to the total sum of $101,568.77.
Iselin's original claim asserted a preference amount of $19,338.00 based upon its factoring contract. During the trial, Iselin, along with the other creditors, presented evidence in support of their claims. Iselin's witness, Charles Patrick, testified that the total amount of Iselin's claim was approximately $107,000.00. The attorney then proceeded as follows:
Q. All right. Now thus far, we have filed only alleging the security for the eighteen thousand dollar ($18,000) figure; is that correct?
A. Uh huh.

*913 Q. And we will amend and file as unsecured as to the balance, with the Court's permission?
And at this time I pass the witness.
On May 19, 1981, at the trial's conclusion, the chancellor rendered his opinion denying any creditor priority status. On May 22, 1981 Iselin then filed an amended proof of claim for the total claim of $101,568.77. The pleading stated "Leave of Court having been first granted during the testimony of Charles Patrick... Iselin ... now files its Amended Proof of Claim to conform to the evidence." There was no request to nor permission from the court to amend reflected in the record. Upon the filing of this amended claim, the other creditors objected, and the trial court disallowed the amendment.
Thus, the question presented is whether the trial court committed error in disallowing an amendment after trial and the rendering of an opinion.
It is a well-established principle that courts may only award that relief which is requested in the pleadings; and since attorneys sometimes fail to write perfect pleadings, it is necessary that courts permit liberal amendments of the pleadings in order to reach the actual merits of a controversy. In chancery practice, section 11-5-53 follows that general principle, and it provides that: "amendments shall be allowed in the pleadings and proceedings, on liberal terms, to prevent delay and injustice." Miss. Code Ann. § 11-5-53 (1972).
However, there are certain limits on permitting amendments. An application to amend should be prompt and not the result of an inexcusable want of diligence. Osborne v. Vince, 240 Miss. 807, 129 So.2d 345 (1961). Moreover, amendments which are permitted in the latter stages of litigation may deny the important policy favoring finality of judgments and the expeditious termination of litigation. Thus, liberality in permitting amendments is not allowed to encourage delay, laches and negligence. Griffith, Mississippi Chancery Practice § 392 (2d ed. 1950).
Additionally, an amended pleading may unfairly prejudice the adverse party. See Saxon v. Harvey, 190 So.2d 901 (Miss. 1966) (amendment should have been permitted where it would not have resulted in surprise or injustice). For example, the adverse party may be put to the added burden of further discovery, preparation and expense. And, the adverse party may have little time to investigate and acquaint itself with the new matter alleged in the amended pleading.
In light of the above considerations, we have consistently affirmed a chancellor's denial of an amendment in cases similar to the one now under consideration. In Rolkosky v. Rolkosky, 237 Miss. 89, 113 So.2d 661 (1959), the appellant contended that the chancellor erred in overruling her motion to amend her petition to conform to the proof. The motion was filed after the cause was submitted and the chancellor had announced his decision. The Court affirmed the chancellor's decision since the appellant's delay in filing the application to amend did not meet the requirement of due diligence. Similarly, in Olivari v. Clark, 175 Miss. 883, 168 So. 465 (1936), the Court concluded that a chancellor's refusal to allow an amendment was not error where the proposal to amend was not made until after the lower court had indicated its final decision on the case. Finally, in the old case of Duggan v. Champlin, 75 Miss. 441, 23 So. 179 (1898), the Court concluded that a request for an amendment came too late when made after the presentation of evidence and during the arguments.
Under the precedent established in the Rolkosky, Olivari, and Duggan cases cited above, the amended proof of claim simply came too late. The chancellor's denial of the amendment should be affirmed.

II.
The cross-appellants, Tupelo Foam Sales and Peak Textiles, contend that the lower court erred in ruling that they, as judgment creditors, did not have priority over the general creditors. But, there were several reasons advanced by the other parties as to *914 why the chancellor's ruling on that issue should be affirmed. In considering this issue, it might be of some help to consider first the statutes involved in Delta's auction sale of Moran's assets.
Delta conducted the auction sale pursuant to section 75-6-108 of the Mississippi Code Annotated (1972). That statute is a provision adopted from the Uniform Commercial Code, which deals with "bulk sales." The statute provides in part:
§ 75-6-108. Auction sales; "auctioneer".
.....
(3) The person or persons other than the transferor who direct, control or are responsible for the auction are collectively called the "auctioneer." The auctioneer shall:

.....
(c) assure that the net proceeds of the auction are applied as provided in this chapter (Section 6-106) [§ 75-6-106].

A.
The general creditors' first argument in favor of affirmance is based on subsection 3(c) above which requires that the proceeds of the auction sale be applied as provided for in section 75-6-106. Section 75-6-106 in turn states that if the consideration paid "is not enough to pay all of the [debtor-transferor's] ... debts in full distribution shall be made pro rata." (emphasis added) Miss. Code Ann. § 75-6-106(3) (1972). In other words, the general creditors contend that section 75-6-106 requires a pro rata distribution regardless of the fact that some creditors may have secured interests. Although there are no Mississippi cases on point, at least three courts from other jurisdictions have considered this issue.
In Huguelet v. M & M Associates, Inc., 375 So.2d 1150, 27 U.C.C.Rptr. 1091 (Fla. App. 1979), the appellant argued that a trial judge erred in giving preference to secured over unsecured creditors of bulk sale property sold pursuant to Article Six of the Uniform Commercial Code. It was the appellant's contention that the statutory language providing for a pro rata distribution was to be interpreted literally and without exception.
However, the Florida appellate court disagreed. It reasoned that the provisions of Article Six must be construed together with the provisions of Article Nine dealing with security interests. And, under section 9-201 of the Uniform Commercial Code, a security interest continues in collateral notwithstanding the sale, exchange or other disposition of the property by the debtor. Thus, the Florida court concluded that the secured creditors were to be paid first, and any balance remaining was to be distributed on a pro rata basis to the unsecured creditors.
The Kentucky Court of Appeals would apparently rule the same way. In the case of Bomanzi of Lexington, Inc. v. Tafel, 415 S.W.2d 627, 4 U.C.C.Rptr. 588 (Ky. 1967), the Kentucky court commented with respect to bulk sales that pro rata distribution among creditors, but subject to priority, if any, was required before the adoption of the Uniform Commercial Code. And, the court stated that the same policy was continued in the legislative statutes adopting the Uniform Commercial Code.
Finally, the Pennsylvania Court of Common Pleas considered the question of whether or not lien creditors should be entitled to a preference, under the bulk transfer law in the Uniform Commercial Code, where proceeds have been paid into a court for distribution to creditors. In re Bulk Sale of Clement, 98 Dauph. 55, 71 Pa.D & C 2d 717, 18 U.C.C.Rptr. 1280 (C.P. 1976). In that case two creditors had acquired secured status by obtaining writs of execution and attachment against property involved in a bulk sale. The Pennsylvania court quoted with approval the following language, from 3 R. Anderson, Uniform Commercial Code 472 n. 14 (2d ed. 1971), in reference to the code requirement that all creditors be paid on a pro rata basis:
This necessarily assumes the absence of any valid security interest or other right which would give a creditor a preference *915 or priority over other creditors generally or with reference to particular property.
The Pennsylvania court then concluded that the two creditors were entitled to a preference as a result of their secured status.
The decisions noted above are persuasive authority, and this Court holds that a secured status cannot be destroyed simply because the debtor's assets were ultimately sold in a bulk transfer auction sale.

B.
The next argument advanced by the general creditors for affirmance is far more persuasive. It requires us to decide whether or not the judgment liens attached to the proceeds of the auction sale when they were deposited into the registry of the lower court. Under section 11-7-191 of the Miss. Code Ann. (1972), an enrolled judgment constitutes a lien on all property of the judgment defendant which is in the county where the judgment was enrolled. This section has been generally construed by this Court, with some exceptions, to mean that an enrolled judgment is a lien on both real and personal property owned or acquired by the judgment defendant. Motor Securities Co., Inc. v. B.M. Stevens Co., 225 Miss. 361, 83 So.2d 177 (1955).
However, notwithstanding the broad statutory language, our decisions have excepted intangible property, such as vouchers for the payment of money and the right to receive money, from being subject to a judgment lien without garnishment or other appropriate writ. See Simmons-Belk, Inc. v. May, 283 So.2d 592 (Miss. 1973) (promissory note); Bank of Monticello v. L.D. Powell Co., 159 Miss. 183, 130 So. 292 (1930) (decree allowing solicitor fee in partition cause was not subject to lien of enrolled judgment against the solicitor); R.F. Walden & Co. v. Yates, 111 Miss. 631, 71 So. 897 (1916) (voucher for payment of money); Bryan v. Henderson Supply Co., 107 Miss. 255, 65 So. 242 (1914) (choses in action).
In addition, our cases have also consistently held that money is not subject to an enrolled judgment lien absent a seizure of the money. McPhillips Constr. Co. v. Carter-Murphy Constr. Co., 227 So.2d 302 (Miss. 1969) (no lien established against overbids in amount of $1,502.70 paid into registry of court where judgment creditors never attempted to garnish or attach the overbids); Henry v. Alexander, 131 Miss. 588, 94 So. 846 (Miss. 1923) (lien on money begins from seizure and not from date of judgment); Cahn v. Person, 56 Miss. 360 (1879) (same). The Cahn case explained the rationale for distinguishing between money and intangible property from other personal property held by the defendant in the following language: "Money, under the statute, is liable to seizure under execution, but the lien begins from the seizure, and not from the date of the judgment. The law does not affix a lien to things so fugitive, which circulate as currency, and are so impossible to identify." [Id. at 363].
In this case, neither Tupelo Foam Sales nor Peak Textiles obtained a writ of garnishment or other appropriate writ to seize the proceeds from the auction sale. Having failed to do so, their enrolled judgments were inadequate to subject the proceeds to the judgment liens. Thus, the cross-appellants were not entitled to a preferred status.
AFFIRMED.
PATTERSON, C.J., WALKER and BROOM, P. JJ, and ROY NOBLE LEE, BOWLING, HAWKINS, DAN M. LEE and ROBERTSON, JJ., concur.
NOTES
[1] There is some question indicated by the record as to whether Iselin received notice of the sale. However, no issues were raised on appeal considering this point.