583 So.2d 614 (1991)
NATURAL MOTHER
v.
PATERNAL AUNT.
No. 90-CA-0357.
Supreme Court of Mississippi.
June 19, 1991.
*615 Robert G. Gilder, Southaven, for appellant.
Percy L. Lynchard, Jr., Hernando, for appellee.
Before DAN M. LEE, P.J., and PRATHER and BANKS, JJ.
BANKS, Justice, for the Court:
Natural mother, designated herein as S.J., appeals from a decree entered by the Chancery Court of DeSoto County, Chancellor Leon E. Hannaford, Sr., terminating her parental rights. The paternal aunt of the children, designated herein as C.H., involved in this action, filed a petition for adoption in the chancery court. The natural father, designated herein as J.M., consented to adoption of the children by his sister. S.J., the children's natural mother contested the petition for adoption. She filed an answer in which she denied the material allegations of and objected to the granting of the petition. Several months later, immediately preceding trial, S.J. filed a writ of habeas corpus in which she sought custody of the children. She now appeals from the final decree granting the petition for adoption and terminating her parental rights. Finding that the chancellor committed no error, we affirm[1].

Facts
The pertinent facts are, for the most part, uncontroverted. In 1978, S.J. met and began to date J.M., contrary to her mother's wishes. At the time, S.J. was fourteen (14) and J.M., nineteen (19). Testimony at trial revealed that prior to dating J.M., S.J. was an average teenager. While dating J.M., she became quite rebellious and at age sixteen (16) gave birth to a child born April 11, 1982. Shortly after the birth of the infant, J.M. was convicted for drug distribution in Mississippi and Tennessee. He served time in penal institutions in both states. Upon his release from prison, S.J. became pregnant with their second child, who was born May 15, 1985.
In January 1986, S.J. sought treatment for drug addiction. Apparently, while dating J.M., S.J. began using and abusing drugs. Her addiction became so serious that she sought professional help and, with the aid of her mother, she was admitted to Memphis House for rehabilitation and treatment. She remained there four months.
Prior to her admission into the rehabilitation clinic, S.J. left the children, then aged three (3) years and six (6) months with J.M. At trial, she admitted that at the time she left the children with their father, she knew he was a convicted felon, had a drug problem, and was living with a woman, out of wedlock. Immediately upon receiving the children, J.M. took them to his sister, C.H., who has had them since January 1986.
In March of 1986, C.H. petitioned the juvenile court of Shelby County, Tennessee, for custody of the children. Service of process was attempted on S.J. approximately three times but was never obtained because she was at Memphis House unbeknownst to C.H. or the process server. S.J., however, was informed by one of the counselors at the rehabilitation center that C.H. was attempting to obtain custody. At trial, she stated that she chose not to contest the proceedings because her step-father, a former justice court judge, told her that custody could not be granted without her consent or presence at the hearing. Contrary to her step-father's pronouncement, *616 the juvenile court granted custody of the children to C.H. on May 6, 1986.
S.J. was released from Memphis House in July of 1986. After her release, she contacted C.H. and sought to see the children. C.H. consented to a visit between the children and S.J. at her (C.H.'s) mother's house. S.J. found the visit upsetting, as the children had bonded with C.H., considering her their "mamma." She also thought C.H. was hostile toward her.
In September of 1986, natural mother left the Memphis area and relocated to Georgia. When she left, she did not notify anyone of her whereabouts. She even refused to give her mother an address and phone number where she could be reached. After moving to Georgia, she saw the children once more at Christmas in 1989[2]. Both C.H. and S.J. testified that, from July of 1986 to Christmas 1989, there was no communication from S.J. to the children. S.J. stated that she made efforts to reach the children through phone calls to C.H. in August and September of 1986 and sometime in 1987; she, however, was unsure of the dates. By all accounts, at the time of the trial, S.J. had only seen the children twice since she left them in January 1986.[3]
In May of 1989, C.H. filed a petition for adoption in the Chancery Court of DeSoto County[4]. Pursuant to an agreed order entered on September 29, 1989, trial was set for January 18, 1990. On January 16, 1990, two days before trial, S.J. filed a petition for writ of habeas corpus or in the alternative, modification of custody decree. In the writ, she alleged that since C.H. was awarded custody of the children without personal service of process upon her, the order of the Tennessee court was void. The trial court refused to hear the petition for writ of habeas corpus. Trial ensued. At the trial, the chancellor entered an order appointing a guardian ad litem for and on behalf of the minor children. Testimony was heard from witnesses called by both parties. At the conclusion of the trial, the court granted the petition for adoption. Aggrieved by the chancellor's decision, S.J. brings this appeal.

II
S.J. argues that the trial court's refusal to hear the writ violates both the federal and state constitutions, as well as long-standing case law. C.H. contends that the court was correct in its refusal to hear the petition. She states that the petition requesting the writ of habeas corpus was filed under the same cause number as the petition for adoption, thus it can only be construed as an amendment to the original answer filed by S.J. As such, it is to be considered with reference to our rules of civil procedure which apply to these proceedings except to the extent that they are expressly contrary to the statutory scheme governing the subject matter. Miss. R.Civ.P. 81.
Miss.R.Civ.P. 15(a) provides inter alia that after a responsive pleading or the passage of thirty days following service of a pleading to which no responsive pleading is permitted "a party may amend his pleading only by leave of court or upon written consent of the adverse party; leave should be freely given when justice so requires." The matter of amendments to pleadings lies within the discretion of the lower court, Bourn v. Tomlinson Interest, Inc., 456 So.2d 747, 749 (Miss. 1984); Red Enterprises, Inc. v. Peashooter, Inc., 455 So.2d 793, *617 795 (Miss. 1984), and "an application to amend should be prompt and not the result of an inexcusable want of diligence." William Iselin & Co., Inc. v. Delta Auction, 433 So.2d 911 (1983) quoting Osborne v. Vince, 240 Miss. 807, 129 So.2d 345 (1961). Although William Iselin & Co., Inc. relied on Miss. Code Ann. § 11-5-53 which has been supplanted by Miss.R.Civ.P. 15, the principle embodied in the rule is the same as the statute. See also, Red Enterprises, Inc. v. Peashooter, Inc., 455 So.2d at 795 (intimating that leave to amend should not be granted where there exists undue delay, bad faith, or dilatory motive on the part of the movant). The Court in William Iselin & Co., Inc. also stated,
Moreover, amendments which are permitted in the latter stages of litigation may deny the important policy favoring finality of judgments and the expeditious termination of litigation. Thus, liberality in permitting amendments is not allowed to encourage delay, laches and negligence. Griffith, Mississippi Chancery Practice § 392 (2d ed. 1950).
Additionally, an amended pleading may unfairly prejudice the adverse party. See Saxon v. Harvey, 190 So.2d 901 (Miss. 1966) (amendment should have been permitted where it would not have resulted in surprise or injustice)
William Iselin & Co., Inc., 433 So.2d at 913.
The William Iselin & Co., Inc. Court gave as an example a situation where the adverse party in addition to being burdened with more discovery, preparation, and expense, may have little time to investigate and acquaint itself with the new matter in the amended pleadings if an amendment were allowed. This would have been the scenario in the instant case if the trial court had heard the petition requesting the writ. S.J. sought to amend her pleading a mere two days before trial to put the issue of the legality of the Tennessee custody order before the court. Clearly, the grant of the petition would have prejudiced C.H. who at this juncture was poised and ready for trial on the petition for adoption and was unaware of any other issues against which she would have to defend.
This Court has consistently affirmed a chancellor's denial of an amendment where the party requesting the amendment has not exercised due diligence in filing the application to amend. Cf. Rolkosky v. Rolkosky, 237 Miss. 89, 113 So.2d 661 (1959) (chancellor committed no error in denying amendment where motion was filed after the cause was submitted and the chancellor announced decision), Olivari v. Clark, 175 Miss. 883, 168 So. 465 (1936) (chancellor's refusal to allow an amendment was not error where the lower court had indicated its final decision on the case), Duggan v. Champlin, 75 Miss. 441, 23 So. 179 (1898) (request for amendment was too late as it was made after the presentation of evidence and during the arguments). Other courts have held that it was not an abuse of discretion for a trial judge to deny leave to amend immediately before trial. See Woodson v. Fulton, 614 F.2d 940, 942 (4th Cir.1980); accord, Feldman v. Allegheny Intern, Inc., 850 F.2d 1217 (7th Cir.1988) (district court did not abuse its discretion in denying request for leave to amend pleadings where proposed amendment was made three weeks before trial and over four years after litigation began).
Moreover, the issue of whether C.H. properly had custody was one which would be moot if the result of the adoption hearing was favorable to C.H. If the result were unfavorable, that issue would then be ripe for resolution. The question of whether the custody was attained by a proceeding which deprived S.J. of due process had no bearing on the adoption decision. The chancellor's having granted the petition for adoption renders the issue of custody moot.
The grant of an adoption terminates the parental rights of the parent(s) and places the adopted child or children in the custody of the adoptive parents. Miss. Code Ann. §§ 93-15-101  XX-XX-XXX. See also, Adams v. Adams, 467 So.2d 211, 215 (Miss. 1985) ("Upon adoption, a natural parent is relieved of future support for that adopted child, and the civil responsibility for support is transferred to the adoptive parent"); W.R. Fairchild Construction Co. v. Owens, *618 224 So.2d 571 (Miss. 1969) ("[I]t was the intention of the legislature in the passage of this adoption act to sever all rights, duties and obligations of the natural parent toward the child adopted, and to bestow those rights, duties and obligations upon the adopting parent just the same as if the child had been born in wedlock to the adoptive parents." Id. at 572.)
Thus, as the adoption proceeding not only determined what are the best interests of the child, but also who should have custody, there was no need for the chancellor to address the habeas application. By addressing and granting the petition for adoption, the chancellor necessarily adjudicated custody anew. Indeed, all proof which might have been presented at the original custody hearing had S.J. been served and elected to respond was before the court and in the evidence during the trial. This assignment of error is without merit.

III
S.J. attacks the lower court's finding that she abandoned and deserted her minor children. Miss. Code Ann. § 93-17-7 outlines the procedure to be followed when a parent objects to the adoption. That section provides, in relevant part,
§ 93-17-7. Objection of parent  termination of unfit parents' rights.
No infant shall be adopted to any person if either parent, after having been summoned, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, being within any of the grounds requiring termination of parental rights as set forth in subsections (2) and (3)(a), (b), (d) or (e) of Section 93-15-103 in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the child, or children, sought to be adopted.
Miss. Code Ann. § 93-15-103 provides in pertinent part,
§ 93-15-103. Factors justifying adoption  grounds for termination of parental rights  alternatives.
(3) grounds for termination of parental rights shall be based on one or more of the following factors:
(a) A parent has deserted without means of identification or abandoned and made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
* * * * * *
(e) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment. (Emphasis added).
Thus, in passing upon the adoption of the children, the court must first determine that one of the grounds for adoption is present; (1) desertion or abandonment or (2) moral unfitness. In the Matter of Yarber, 341 So.2d 108, 110 (Miss. 1977). The adoption statute also requires a definite adjudication that the best interest of the child is promoted or enhanced by the proposed adoption. Ainsworth v. Natural Father, 414 So.2d 417, 421 (Miss. 1982).
Here, the evidence conclusively established that both grounds for adoption were present. First, as to abandonment, several cases have defined what is meant by that term as it relates to adoption[5]. Abandonment refers to any conduct by a parent which "evinces a settled purpose to forego all duties and relinquish all parental claims to the child." Ainsworth v. Natural *619 Father, 414 So.2d 417, 419 (Miss. 1982). By all accounts, at the time of trial, S.J. had only seen the children two times since January of 1986 when she left them with their father. Specifically, she visited with the children in July of 1986, after her release from the treatment center and also on Christmas Eve in 1989. Between July of 1986 and Christmas 1989, both S.J. and C.H. testified that there was no contact between natural mother and the children. S.J. testified that she tried to contact C.H. in August and/or September of 1986 and sometime in 1987, but she was unsure of the dates.
C.H. testified that she had never received any assistance from natural mother and only paltry amounts from J.M. In addition to not helping financially, S.J. admitted that she did not try to send birthday cards or Christmas gifts to the girls; she also ignored other events in the children's lives. On cross-examination, she acknowledged that she basically had been out of their lives for the preceding three-and-one-half (3 and 1/2) years. Furthermore, both children thought of and referred to paternal aunt as their mother. Moreover, though the older child knew who S.J. was when she saw her, the younger child did not know S.J. at all; S.J. had left when the younger child was six (6) months old. The evidence amply supports the conclusion that there had been a substantial erosion of the parent child relationship due to prolonged absence and lack of communication. Ainsworth, 414 So.2d 417 (Miss. 1982).[6]

IV
Finally, S.J. argues the court erred in finding that the best interest of the children would be served if the petition for adoption were granted. As stated, the pre-eminent concern in cases involving custody of a child is the child's best interest. Ainsworth, 414 So.2d 417 (Miss. 1982); J.C. v. Natural Parents, 417 So.2d 529 (Miss. 1982); Albright v. Albright, 437 So.2d 1003, 1004 (Miss. 1983). Factors to be considered in determining the child's best interest are stability of environment, ties between prospective adopting parents and children, moral fitness of parents, home, school and community record of the child. J.C. v. Natural Parents, and Albright v. Albright, supra.
Application of these factors to the case at bar lends overwhelming support to the chancellor's decree granting C.H.'s petition to adopt the children. C.H. testified that when the children first arrived, they were nervous and unsure, but they have since settled and are "wonderful" and "well-adjusted." She stated they attend Sunday school and consider her two children their brother and sister. The children visit doctors regularly. They are both in school and doing well; at the time of the trial, the youngest child was in pre-school and the oldest in second grade. The oldest had made the honor roll twice. C.H. went on to state that the relationship among the children is good  they love and take care of, do things for, and are close to each other.
The lower court found that C.H. had done an excellent job rearing the children involved in this proceeding, as well as her own, without financial assistance from anyone  private or public. Indeed, even S.J. admitted that the children were being taken care of. The court went on to state that no deficiencies in C.H.'s care of and for the children were presented by any witnesses. The court's findings are amply supported by the record.

V
In order to sever the rights of a natural parent objecting to an adoption, the burden is on the party seeking to adopt to show by clear and convincing evidence that the objecting parent has either abandoned or *620 deserted the child or is mentally, morally or otherwise unfit to rear or train the child. Petit v. Holifield, 443 So.2d 874, 877 (Miss. 1984) and other cases cited therein. The chancellor's opinion finding that C.H. met this burden is not manifestly in error, and the decree granting C.H.'s petition for adoption is affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
NOTES
[1] Pursuant to Miss. Code Ann. §§ 93-17-25, 93-17-29, and 93-17-31, (1972) the actual names of the children and parties are not used.
[2] This visit was precipitated by S.J.'s mother who threatened to get a court order allowing the children to visit with them, in the event C.H. did not agree to her request for visitation. C.H. agreed and the children visited with their maternal family on Christmas Eve 1989.
[3] S.J. seeks to explain her neglect of the children by C.H.'s actions in refusing to divulge her home address. She scores no points before this Court with such a paltry excuse, for she at all times has had C.H.'s work address and number. She also knew how to contact J.M., as well as, his parents. Moreover, when she wanted to see the children, she did  her lack of knowledge of C.H.'s address, notwithstanding. Additionally, there were times when S.J. was in Southaven and did not see or even attempt to see the children.
[4] In November of 1986, C.H. moved to Southaven, Mississippi. She did not notify S.J. as she did not know how to reach her. She did tell the juvenile court in Tennessee, and court personnel stated that her relocation did not matter as long as she worked in the same place.
[5] Cf. Wright v. Fitzgibbons, 198 Miss. 471, 21 So.2d 709 (1945); In re Hall, 202 So.2d 641 (Miss. 1967); Doe v. Attorney W., 410 So.2d 1312 (Miss. 1982) (conduct manifesting a settled purpose to forego all duties and relinquish parental claims to the child).
[6] The Chancellor also found that S.J. was an unfit mother. At the time of trial S.J. was married and working as a waitress. She reported that she was drug free. Up until two months before trial, however, she had continued to work as a topless waitress and had been living out-of-wedlock for one and one-half years with the man she later married. On these facts, the Chancellor concluded that S.J. had not sufficiently forsworn her former lifestyle to be a fit mother. Because we determine that the chancellor had sufficient grounds to terminate parental rights on grounds of abandonment we need not reach this issue.