933 So.2d 971 (2006)
K.D.F. and J.C.F.
v.
J.L.H.
No. 2004-CA-01320-SCT.
Supreme Court of Mississippi.
May 25, 2006.
Rehearing Denied July 27, 2006.
*973 E. Foley Ranson, Ocean Springs, attorney for appellant.
Donald P. Sigalas, Pascagoula, attorney for appellee.
Before SMITH, C.J., CARLSON and DICKINSON, JJ.
DICKINSON, Justice, for the Court.
¶ 1. This is an adoption case which involves a chancellor's refusal to terminate the parental rights of a natural father on the grounds of abandonment or moral/mental unfitness and the subsequent denial of the Appellants' adoption petition. A second matter concerns the chancellor's award of temporary custody of the child to the natural father. The question presented is whether the chancellor committed manifest error in finding the Appellants failed to present clear and convincing evidence of the natural father's unfitness to maintain his parental rights.

BACKGROUND FACTS AND PROCEEDINGS
¶ 2. While working as a convenience store clerk in June 2000, John Harris,[1] age 26, met Amy Rogers, age 18. Harris was living with his parents while attending the University of South Alabama, and Rogers was unemployed and had no permanent residence. When Harris and Rogers met, Rogers had already given birth to two illegitimate children, one given up for adoption and the other temporarily taken from her by the Jackson County Department of Human Services.
¶ 3. Within a few weeks, Rogers moved into Harris' parents' home, and the two began having sexual relations, part of the time without birth control. Approximately two months later, Rogers stayed out all night, and Harris forced her to leave his parents' home.
¶ 4. Rogers quickly resumed her relationship with Robert Hicks, a man she had previously dated and who was the father of one of her children. Shortly after the breakup, Harris learned Rogers was pregnant through a phone call he received from Hicks, who requested money for Rogers to have an abortion. Harris contacted an attorney to inquire whether he could stop the abortion, but he was informed he could not. He therefore assumed he had no rights with respect to the unborn child.
¶ 5. In late October 2000, Rogers went to work for Kim and Jack Foster ("the Fosters") in their laundry and dry cleaning business. In February 2001, Rogers advised the Fosters that she intended to put her baby up for adoption. After some discussion, Rogers agreed to allow the Fosters to adopt her baby. She repeatedly told the Fosters that Hicks was the father of her unborn child.
¶ 6. On May 21, 2001, Rogers gave birth to Elizabeth. The Fosters took Elizabeth from the hospital to their home where she has since lived. On June 5, 2001, Rogers executed a Consent to Adoption agreement with the Fosters. A Petition for Adoption, naming Rogers and Hicks as Elizabeth's *974 natural parents, was filed on August 9, 2002.
¶ 7. From August 2000 (according to Harris) or October 2000 (according to Rogers) until late July 2002, Harris had no contact with Rogers. After graduating from college in May 2001, Harris enrolled in the Mississippi College School of Law. He left the law school after the fall semester and returned home to Pascagoula in the summer of 2002. At some point during the semester, Harris acquired Elizabeth's birth announcement and kept it.
¶ 8. In late July 2002, Harris ran into Rogers at a grocery store where she showed him a picture of Elizabeth. After this encounter, Harris consulted an attorney about his potential parental rights. After this meeting, Rogers informed the Fosters that Harris, not Hicks, was Elizabeth's biological father.
¶ 9. In September 2002, Harris filed an objection to the Fosters' Petition for Adoption. DNA testing proved Harris was Elizabeth's biological father. The Fosters filed an Amended Petition for Adoption and for Termination of Parental Rights, naming Harris as the defendant. Harris then filed a Motion to Establish Paternity and an Answer to the Fosters' Petition. Chancellor Pat H. Watts, Jr., joined these issues.
¶ 10. The chancellor appointed Ms. Janice Perrealt, Esquire, as guardian ad litem for Elizabeth. She prepared and filed a report recommending the Fosters be allowed to adopt Elizabeth based on Harris' abandonment.
¶ 11. On February 6, 2004, the chancellor entered his Opinion denying the Fosters' adoption petition and awarding temporary custody of Elizabeth to Harris. Final Judgement was entered on March 9, 2004. The Fosters then filed a Motion for New Trial, to Alter and Amend Judgment and for Reconsideration. Chancellor Watts entered an Order on June 24, 2004, denying the Fosters' requested relief, but awarding physical custody of Elizabeth to the Fosters "until the Judgment of March 9, 2004 is enforceable, or until further order of this Court."
¶ 12. On June 24, 2004, the Fosters appealed Chancellor Watts' Order.[2] The Fosters also filed an Application for Stay of Judgment Pending Appeal seeking to retain physical custody of Elizabeth during the appeals process. The chancellor entered a Judgment granting physical custody of Elizabeth to the Fosters until final decision on appeal, subject to Harris' visitation as previously ordered.
¶ 13. The Fosters raise two issues for review by this Court: (1) whether the chancellor erred in denying their petition *975 to adopt Elizabeth; and (2) whether the chancellor erred in awarding temporary physical custody of Elizabeth to Harris.

DISCUSSION AND ANALYSIS

I. Whether the chancellor erred in denying the Fosters' petition to adopt Elizabeth.
¶ 14. The Fosters claim the chancellor erred in denying their petition to adopt Elizabeth and to terminate Harris' parental rights. Under this Court's well-established standard of review concerning the termination of parental rights, "[t]he chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test." Vance v. Lincoln County Dep't of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985); Veselits v. Cruthirds, 548 So.2d 1312, 1316 (Miss.1989)). Accordingly, this Court does not ask how it would have decided the case ab initio; rather, we examine whether credible proof exists to support the chancellor's findings of fact by clear and convincing evidence. S.N.C. v. J.R.D., 755 So.2d 1077, 1080 (Miss.2000). It is not this Court's role to substitute its judgment for the chancellor's. Hensarling v. Hensarling, 824 So.2d 583, 587 (Miss. 2002).

Statutory Authority and Relevant Case Law
¶ 15. A chancellor must look to several statutory provisions as well as established case law when determining whether to terminate a natural parent's rights and permit a contested adoption. Mississippi Code Annotated Section 93-17-6 dictates when a father has a right to object to an adoption. The relevant sections state:
(4) Proof of an alleged father's full commitment to the responsibilities of parenthood would be shown by proof that, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
(a) Provided financial support, including, but not limited to, the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, and contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child; or
(b) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.
(5) If the court determines that the alleged father has not met his full responsibilities of parenthood, it shall enter an order terminating his parental rights and he shall have no right to object to an adoption under Section 93-17-7.
(6) If the court determines that the alleged father has met his full responsibilities of parenthood and that he objects to the child's adoption, the court shall set the matter as a contested adoption in accord with Section 93-17-8.
Miss.Code Ann. § 93-17-6 (2002).
¶ 16. When a natural parent objects to the adoption of his or her infant child, a chancellor may nonetheless permit the adoption if the objecting parent has *976 "abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, those matters set out in subsection (2) of this section." Miss.Code Ann. § 93-17-7(1) (2002). The criteria to be considered by the chancellor are set forth in the statute, and include in relevant part:
(b) The parent has not consistently offered to provide reasonably necessary food, clothing, appropriate shelter and treatment for the child.
(c) The parent suffers from a medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse or chemical dependency which makes him unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
(d) Viewed in its entirety, the parent's past or present conduct, including his criminal convictions, would pose a risk of substantial harm to the physical, mental or emotional health of the child.
(f) The enumeration of conduct or omissions in this subsection (2) in no way limits the court's power to such enumerated conduct or omissions in determining a parent's abandonment or desertion of the child or unfitness under subsection (1) of this section.
Miss.Code.Ann. § 93-17-7(2).
¶ 17. In a contested adoption, Mississippi Code Annotated Section 93-17-8(1)(c) requires the chancellor to "determine first whether or not the objecting parent is entitled to so object under the criteria of Section 93-17-7 and then shall determine the custody of the child in accord with the best interests of the child and the rights of the parties as established by the hearings and judgments." Miss.Code Ann. § 93-17-8 (2002).
¶ 18. Mississippi adheres to the "natural parent presumption," which states, "[t]here is a presumption that a natural parent is the proper custodian for their [sic] child." In re the Custody of M.A.G., 859 So.2d 1001, 1003 (Miss.2003) (citing Logan v. Logan, 730 So.2d 1124, 1125 (Miss.1998)). The petitioners carry the burden "to show by clear and convincing evidence that the objecting parent has either abandoned or deserted the child or is mentally or morally or otherwise unfit to rear or train the child." Petit v. Holifield, 443 So.2d 874, 877 (Miss.1984) (emphasis added).
¶ 19. In Ainsworth v. Natural Father, 414 So.2d 417, 420 (Miss.1982), this Court distinguished abandonment from desertion, stating, "abandonment has to do with the relinquishment of a right or claim, whereas desertion involves an avoidance of a duty or obligation." We have defined abandonment as "any conduct by a parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child." Natural Mother v. Paternal Aunt, 583 So.2d 614, 618 (Miss.1991). "The test is an objective one: whether under the totality of the circumstances ... the natural parent has manifested [his] severance of all ties with the child." Ethredge v. Yawn, 605 So.2d 761, 764 (Miss. 1992).
¶ 20. The Fosters argue Harris' parental rights should be terminated and the adoption allowed to proceed based on two grounds  that he abandoned Elizabeth and that he is mentally and morally unfit to rear and train Elizabeth. The chancellor carefully considered the Fosters' evidence and found it failed to reach the necessary clear and convincing standard. So long as credible proof supports the chancellor's findings of fact, we must affirm *977 the decision. It is not this Court's role to substitute its judgment for that of the chancellor. Lee v. Lee, 798 So.2d 1284, 1290 (Miss.2001)

Abandonment as Grounds for Termination of Harris' Parental Rights
¶ 21. The chancellor began his Opinion by stating his foundation belief "that before you can abandon or desert something or someone, the abandoning or deserting party must or should know that the person or thing abandoned or deserted actually exists ...."[3] In other words, the Fosters' claim that Harris abandoned Elizabeth must be examined and judged from the time Harris knew or should have known that Elizabeth was his child. The chancellor then framed the issues before him:
[W]hether or not the Father knew or should have known that the Child was, in fact, his child, and, if so, does the statutory and case law allow him to object to the adoption of the Child by the [Fosters]. Further, that if the Father has the right to object, is it in the best interest of the child that the [Fosters] adopt the Child.
¶ 22. The chancellor found Harris became aware that Elizabeth was his child in July 2002, after a chance meeting with Rogers where she showed him a picture of Elizabeth and told him of the adoption proceedings. Immediately thereafter, Harris contacted the Department of Human Services and an attorney to assess his potential parental rights. The chancellor made the following findings of fact which support his determination that Harris had not abandoned Elizabeth:
(1) Harris and Rogers engaged in a sexual relationship, and Rogers took birth control pills for a portion of this time.
(2) While Rogers did inform Harris that she was pregnant, she never affirmatively stated that he was the father. Rogers later informed Harris that Hicks was the father.
(3) Harris took prenatal vitamins to Rogers in September 2000 because he wanted to get back in her good graces.
(4) In October 2000, Hicks called Harris wanting money for Rogers to have an abortion. Harris contacted an attorney about his rights concerning an abortion and was told he had none. Harris testified that he believed Hicks and Rogers were trying to scam him for money.
(5) Harris tried to contact Rogers through her father, but he was rebuffed. Harris testified that Rogers' father told him that Hicks was the father of her baby.
(6) While Harris was in law school (August 2001  December 2001), someone cut out Elizabeth's birth announcement and sent it to him.
(7) Harris did not have face-to-face contact with Rogers until July 2002. Rogers showed Harris a picture of Elizabeth, and Harris thought Elizabeth was his because she looked like him.
(8) Rogers initially told the Fosters that Hicks was the father of Elizabeth. After seeing Harris in July 2002, she *978 informed the Fosters that Harris, not Hicks, was Elizabeth's father.
(9) In the summer of 2002, Rogers told Harris about the adoption proceedings. He immediately contacted the Department of Human Services and an attorney concerning his legal rights.
(10) Harris testified that he called the Fosters multiple times trying to visit Elizabeth. Harris also testified that when he refused to sign the adoption papers, the Fosters stopped allowing his visitation with Elizabeth until the Court Order of June 2003.
(11) In September 2002, DNA tests established that Harris was Elizabeth's natural father.
(12) Harris frequently bought presents for Elizabeth and delivered them to the Fosters. From October 12, 2002, until the last day of trial, Harris regularly paid child support, without a court order, amounting to $1,824.60. He also attended parenting classes.
¶ 23. Chancellor Watts' findings of fact are supported by the record. Based on this evidence, Chancellor Watts arrived at the following conclusions of law supporting his determination that Harris did not abandon or desert Elizabeth:
(1) While Rogers was living with Harris, she often stayed out all night, giving Harris reason to believe that Rogers was having an affair with Hicks.
(2) Prior to their relationship, both Harris and Rogers had sexual relations with other parties, and Harris questioned Rogers' faithfulness to him.
(3) Harris knew Hicks had fathered an illegitimate child with Rogers. After the break-up, Hicks called Harris about money for an abortion, and Harris heard Rogers, clearly intoxicated, slurring her speech in the background.
(4) Rogers never told Harris that Elizabeth was his. Rather, Rogers told Harris that Hicks was the father.
(5) Rogers' father told Harris that Hicks was Elizabeth's father and that Rogers was living with Hicks.
(6) Harris reasonably could have believed that Elizabeth was not his, even though he failed to take steps to determine whether he was actually the father.
¶ 24. The chancellor conceded that Harris could have done more to determine whether Elizabeth was his child. However, the chancellor noted "his failure to do so should not cause his parental rights to be terminated, and his child allowed to be adopted."
¶ 25. The chancellor found that, once Harris knew Elizabeth was his, he never "evince[d] a settled purpose to forego all duties and relinquish all parental claims to the child," such that he abandoned Elizabeth. See Natural Mother, 583 So.2d at 618. In fact, once he learned about the ongoing adoption proceedings, Harris filed an objection to the adoption and began undertaking the responsibilities of parenthood. See Miss.Code Ann. § 93-17-6. He frequently attempted visitation with Elizabeth, and though there was no court order in place, he provided financial support and bought Elizabeth several holiday gifts. Under the totality of the circumstances, we are unable to find that Chancellor Watts abused his discretion in making the determination that Harris did not "manifest[] [his] severance of all ties with the child." See Ethredge, 605 So.2d at 764.
¶ 26. The chancellor concluded "that when the Father reasonably determined that he was the Father of the Child, he committed himself to the responsibilities of parenthood." The Fosters failed to present clear and convincing evidence that *979 Harris exhibited the intent necessary for a finding of abandonment, so the chancellor denied the Fosters' petition to adopt and to terminate Harris' parental rights. Because the chancellor's determination is amply supported by credible evidence in the record, we affirm the denial of the Fosters' petition to adopt Elizabeth and to terminate Harris' parental rights on the ground of abandonment.

Unfitness as Grounds for Termination of Harris' Parental Rights
¶ 27. The Fosters also claim Harris is mentally and morally unfit to raise Elizabeth. They point to Harris' "longtime substance abuse and chemical dependency and his self-described `incurable disease'" as evidence of his unfitness. The Fosters also note Harris' "pattern of immoral and irresponsible behavior in having unprotected sexual relationships with several young women," as well as his "inability to maintain gainful employment" as support for their petition.
¶ 28. The chancellor acknowledged Harris' status as a recovering alcoholic and drug addict and noted such addictions are a lifetime struggle. However, the chancellor recognized that, at the time of the hearing, Harris had been clean and sober for nearly seven years. Additionally, the record indicates Harris is an active member and meeting leader for both Alcoholics Anonymous and Narcotics Anonymous. Given the remarkable turnaround in his life and his seven years of sobriety, the chancellor declined to hold Harris' past substance abuse against him.
¶ 29. While premarital and unprotected sexual relations can be relevant to a determination of moral fitness, the chancellor found that Harris' actions did not rise to a level requiring termination of his parental rights. The same finding was made with respect to Harris' sporadic employment history, where many of his short-term jobs were held  and lost  during his years of substance abuse.
¶ 30. Again, the petitioners bear the burden of proving mental or moral unfitness by clear and convincing evidence. Petit, 443 So.2d at 877 The chancellor held that the Fosters failed to present adequate evidence of Harris' inability to raise his child based on mental or moral unfitness. The chancellor's decision was not manifestly wrong, as it was supported by credible evidence. Therefore, we affirm the chancellor's denial of the Fosters' petition to adopt Elizabeth and to terminate Harris' parental rights on the ground of unfitness.

Recommendations by the Guardian Ad Litem
¶ 31. The Fosters contend the chancellor did not properly consider the recommendations of Ms. Perrealt, the guardian ad litem, when deciding not to terminate Harris' parental rights and permit their adoption of Elizabeth. Ms. Perrealt found that Harris had abandoned Elizabeth because he knew, or should have known, he was the father. Ms. Perrealt based her conclusion on the following evidence:
(1) Harris had sex with Rogers.
(2) Harris contacted an attorney about stopping an abortion.
(3) Harris bought prenatal vitamins for Rogers.
(4) Harris had Elizabeth's birth announcement and could have counted back nine months to discover the date of conception.
(5) Rogers told Ms. Perrealt that Harris knew he was the father.
(6) Harris allowed nearly a year after Elizabeth's birth to go by before attempting to be a part of her life.
(7) Because Elizabeth had bonded with the Fosters, it was in her best interest *980 to allow the adoption and to terminate Harris' parental rights.
¶ 32. As this Court stated in S.N.C., 755 So.2d at 1082, "there is no requirement that the chancellor defer to the findings of the guardian ad litem, as proposed by the petitioners. Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts." Accordingly, "[t]he guardian ad litem's presence . . . in no way detracts from the chancellor's duty to hear the evidence and make a decision on all of the evidence, not just on the testimony of the guardian ad litem." Id. The chancellor properly included a summary of Ms. Perrealt's recommendations in his opinion, and explained his reasons for not adopting her position. See S.N.C., 755 So.2d at 1082; Gunter v. Gray, 876 So.2d 315, 323 (Miss. 2004).
¶ 33. After considering all the evidence, the chancellor was free to, and indeed obligated to, come to his own conclusions on the issues. As this Court noted in Hensarling:
We may not always agree with a chancellor's decision as to whether the best interests of a child have been met, especially when we must review that decision by reading volumes of documents rather than through personal interaction with the parties before us. However, in custody cases, we are bound by the limits of our standard of review and may reverse only when the decision of the trial court was manifestly wrong, clearly erroneous, or an erroneous legal standard was employed.
Hensarling, 824 So.2d at 586-87; see also Wright v. Stanley, 700 So.2d 274, 280 (Miss.1997); Williams v. Williams, 656 So.2d 325, 330 (Miss.1995). The chancellor's decision was supported by credible evidence. It was neither manifestly wrong nor clearly erroneous, and the chancellor employed the proper legal standards in arriving at his decision. As such, we affirm the chancellor's denial of the Fosters' Petition for Adoption and for Termination of Parental Rights.

II. Whether the chancellor erred in awarding temporary physical custody of Elizabeth to Harris.
¶ 34. The Fosters argue the chancellor erred in awarding temporary physical custody of Elizabeth to Harris without making an on-the-record finding pursuant to the Albright factors. Albright v. Albright, 437 So.2d 1003, 1004-05 (Miss. 1983). They also claim Harris failed to address this issue in his brief and, thus, concedes that the chancellor committed reversible error. The Fosters are incorrect as to both assertions.
¶ 35. In his Opinion, the chancellor addressed the "natural parent presumption," a bedrock principle of Mississippi family law. When deciding a custody dispute between a natural parent and a third party, the chancellor must employ the natural parent presumption.
[I]t is presumed that the best interests of the child will be preserved by it remaining with its parents or parent. In order to overcome this presumption there must be a clear showing that the parent has (1) abandoned the child, or (2) the conduct of the parent is so immoral {as} to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have the custody of his or her child. McKee v. Flynt, 630 So.2d 44, 47 (Miss.1993); Carter v. Taylor, 611 So.2d 874, 876 (Miss.1992); Rodgers v. Rodgers, 274 So.2d 671, 672 (Miss.1973). Absent clear proof of one of the above circumstances, the natural parent is entitled to custody of his or her child. McKee, 630 So.2d at 47 (citing Rutland *981 v. Pridgen, 493 So.2d 952, 954 (Miss. 1986)).
Grant v. Martin, 757 So.2d 264, 265 (Miss. 2000) (emphasis added).
¶ 36. Pursuant to these well-established guidelines, the Fosters were required to show by clear and convincing evidence that Harris abandoned Elizabeth, engaged in immoral conduct detrimental to Elizabeth, or was mentally or otherwise unfit to have custody of Elizabeth. The chancellor determined that the Fosters failed to present sufficient evidence on any of these grounds. Absent clear and convincing proof of any of those circumstances, "the natural parent is entitled to custody of his or her child." McKee, 630 So.2d at 47 (emphasis added). Harris did not abandon this argument, but repeatedly emphasized it in his brief.
¶ 37. Given the presumption which bound Chancellor Watts, and binds this Court, a finding of abandonment or unfitness "is necessary to award custody to a third party against a natural parent and must be done before any analysis using the Albright factors to determine the best interests of the child." M.A.G., 859 So.2d at 1004. Because the Fosters never satisfied the first requirement, we affirm the chancellor's award of temporary physical custody of Elizabeth to Harris.

CONCLUSION
¶ 38. The chancellor's findings of fact were amply supported by credible proof, and his determinations were not manifestly erroneous. Therefore, we affirm the chancellor's denial of the Fosters' petition to adopt Elizabeth and to terminate Harris' parental rights. The chancellor properly concluded that the Fosters' failure to overcome the natural parent presumption entitled Harris to custody of Elizabeth. Thus, we also affirm the chancellor's award of temporary physical custody of Elizabeth to Harris.
¶ 39. AFFIRMED.
SMITH, C.J., WALLER, P.J., DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. COBB, P.J., AND RANDOLPH, J., NOT PARTICIPATING.
NOTES
[1] Pseudonyms will be used in this opinion, rather than the parties' names, in order to protect the identity of the child who is the subject of the adoption petition.
[2] Harris argues the Fosters filed a Notice of Appeal appealing from the chancellor's June 24 Order, not the Final Judgment entered on March 9, 2004. Because the two issues raised on appeal by the Fosters did not arise from the June 24 Order, Harris claims that their arguments are irrelevant to the only issue properly appealed to this Court  that of a new trial. Harris made all of these arguments in his motion to dismiss this appeal.

In their response to Harris' motion to dismiss, the Fosters acknowledged their Notice of Appeal should have included the Final Judgment of March 9, 2004; however, the basis of the appeal was abundantly clear from the Fosters' Statement of the Issues and the Brief of Appellant. The Fosters are obviously appealing the chancellor's denial of the adoption and the award of temporary physical custody to Harris.
M.R.A.P. 3(c) states, in part, "[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal." We already considered Harris' arguments on this issue and found them unconvincing. On September 26, 2005, a panel of this Court denied Harris' motions to strike Appellant's brief and to dismiss the appeal. Therefore, we need not address Harris' near-verbatim rehashing of the grounds for his denied motion.
[3] We need not address Harris' rather convoluted arguments concerning the definitions of "parent" and "father" as used in the relevant adoption statutes. The chancellor appropriately determined that the issue of abandonment must be considered from the time Harris knew or should have known that Elizabeth was his, requiring a finding that he knew during Rogers' pregnancy, shortly after Elizabeth's birth, or fourteen months later when Rogers informed him of the ongoing adoption proceedings.