414 So.2d 417 (1982)
In the Matter of the Adoption of a Minor Child: John Harold AINSWORTH and Elizabeth Anne Ainsworth
v.
NATURAL FATHER.
No. 53167.
Supreme Court of Mississippi.
May 26, 1982.
Thomas T. Buchanan, Billie J. Graham, Laurel, for appellants.
McKenzie & Pickering, Franklin C. McKenzie, Jr., Laurel, for appellee.
*418 EN BANC.
DARDEN, Justice, for the Court:
This is an adoption case that comes to us from the Chancery Court of Jones County. John and Elizabeth Anne Ainsworth filed a petition for Ainsworth to adopt M.D., Anne's son of a former marriage. Anne's former husband, M.D.'s father, is here called Roe,[1] and he objects to the adoption.
The questions presented are whether Roe deserted or abandoned the infant M.D. within the meaning of Mississippi Code Annotated section 93-17-7 (Supp. 1981), and the effect, if any, of the amendment of that statute in 1980 referring to the 1980 statute found as Mississippi Code Annotated section 93-15-103, subsections 3(a), (e) (Supp. 1981).
The chancellor was of the opinion that the actions (or inactions) of Roe, as he found the facts, did not amount to an abandonment or desertion of the child, and that the amendment of 1980 had no effect in this case. We disagree with these conclusions of law, and reverse and remand the case.
Anne's marriage with Roe ended in divorce in January, 1976, when their son, M.D., was about six months old. The divorce decree provided for monthly payments of child support. Roe had moved to Arkansas by the time the decree was rendered, but was furnished a copy. He made support payments directly to Anne until November, 1976, about the time he lost his job and moved in with his mother in Monroe, Louisiana.
During 1976 Roe saw M.D. about five times. On at least one of those occasions he was accompanied by his mother in trips to Laurel. He had relatives in the vicinity of Laurel, but once stayed at the Laurel Holiday Inn and visited with M.D., who was then about thirteen months old. This is the last time Roe saw M.D. He sent him no Christmas present in 1976 nor any Christmas, birthday or other present or card since then.
In March, 1977, Roe and a brother borrowed $15,000 and opened a clothing store in Tallulah, Louisiana. At some later time the brother left the business and Roe continued to operate it. Whether the brother was bought out, or how Roe acquired his interest is not shown.
On March 20, 1977 Roe sent Anne $200 for support money and medical bills and made one more payment in April, 1977. Since then he has contributed nothing to M.D.'s support. There is no indication that the decree for support and provisions for M.D.'s education has ever been modified.
Roe undertakes to excuse his failure to make support payments on financial difficulties and the fact that he did not know where to send the money after Anne moved from an old address following her marriage to Ainsworth in July, 1977. The facts are he has repaid the initial loan of $15,000, established credit sufficient to build up an inventory he values at more than $50,000, and acquired a second clothing store in Orange Beach or Gulf Shores, Alabama. He has also supported himself and the new wife he married in August, 1978.
Anne did not leave Laurel after her remarriage. Roe knew of Anne's parents' address and met friends he and Anne had known in Laurel when he attended clothing markets in Dallas and elsewhere. He made no inquiry as to Anne's whereabouts or M.D.'s condition. He knew the identity of Anne's lawyer from October, 1978. His sole effort to communicate with Anne were unanswered telephone calls to Anne's parents' residence from Hattiesburg and the vicinity of Magee on an occasion when he was driving from Gulf Shores to Tallulah, and sent a letter in July, 1977, and "maybe two" more.
The chancellor found as a fact that Roe did not make a reasonable effort to see M.D. or provide for M.D.'s welfare. We have determined that this finding is supported by clear and convincing proof.
*419 Adoption is a privilege unknown to the common law and exists in Mississippi solely by virtue of statute. Eggleston v. Landrum, 210 Miss. 645, 50 So.2d 364 (1951); Mayfield v. Braund, 217 Miss. 514, 64 So.2d 713, suggestion of error overruled, 217 Miss. 514, 65 So.2d 235 (1953); Brassiell v. Brassiell, 228 Miss. 243, 87 So.2d 699 (1956). In consequence we must look to the statute on the subject, Mississippi Code Annotated sections 93-17-3, et seq. (1972).
Section 93-17-7, dealing with adoption after objection by a parent, was amended effective July 1, 1980. This case was filed August 20, 1980, and was tried under the amended statute.
With the 1980 amendments emphasized, the statute reads as follows:
No infant shall be adopted to any person if either parent, after having been summoned to sign the petition for adoption, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, being within any of the grounds requiring termination of parental rights as set forth in subsections (2) and 3(a), (b), (d), or (e) of section 93-15-103 in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the child, or children, sought to be adopted. Provided, however, the parents shall not be summoned in the adoption proceedings nor have the right to object thereto if the parental rights of the parent or parents have been terminated by the procedure set forth in sections 93-15-101 through XX-XX-XXX, and such termination shall be res judicata on the question of parental abandonment or unfitness in the adoption proceedings. (Emphasis added).
Section 93-15-103 provides in part:
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
(a) A parent has deserted without means of identification or abandoned and made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
... .
(e) When there is an extreme and deepseated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment.
There was no issue or showing made as to Roe's mental or moral fitness or unfitness to rear and train M.D. and those statutory provisions are not involved here.
Section 93-17-7 provides that adoption may be had despite the objection of a parent who has abandoned or deserted an infant child. Evidently, the Legislature made a distinction between desertion and abandonment by the use of the disjunctive.[2] The statute gives us no help in determining either that distinction or the meaning of either term. Turning to the decisions of this Court, we have neither found, nor had our attention called to one that makes a distinction between the two terms.
The term "abandonment" imports any conduct on the part of the parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child. Wright v. Fitzgibbons, 198 Miss. 471, 21 So.2d 709 (1945).
The Oxford English Dictionary (The Clarendon Press, Oxford, 1933, Reprinted 1961) gives us this definition of abandon:

*420 2. To give up the control or discretion of another; to leave to his disposal or mercy; to yield, cede, or surrender absolutely a thing to a person or agent.
Webster's Third New International Dictionary (G. & C. Merriam Co., Springfield, Ma., 1967) has this as a definition of abandon:
1. To cease to assert or exercise an interest, right, or title to especially with the intent of never again resuming or reasserting it.
The O.E.D. (supra), gives us this as a definition of desert (as a verb):
2. To forsake (a person, institution, cause, etc. having moral or legal claims upon one).
3. To forsake one's duty, one's post or one's party.
Webster (supra) has this definition of desert (as a verb):
3a. To break away from or break off associations with (some matter involving legal or moral obligation or some object of loyalty).
It would appear then, that abandonment has to do with the relinquishment of a right or claim, whereas desertion involves an avoidance of a duty or obligation. The definition of abandonment in Wright v. Fitzgibbons, supra, seems to include both avoidance of duty and relinquishment of right.
We believe, and now hold, that where there is a complete disregard for the welfare of a child of tender years over a period of more than three and a half years, and a contumacious refusal to abide by a valid decree of support, with no effort to have it modified, this amounts to desertion of the child. Such desertion, under the statute as we construe it, results in a forfeiture of parental rights whether or not there was an intent to relinquish them.
The appellants contend that the 1980 amendment of section 93-17-7 bringing portions of section 93-15-103 within the purview of the adoption statute had the effect of raising a presumption of abandonment when the time lapses set out in subsection 3(a) had expired. The chancellor held that subsection 3(a) did not undertake to define abandonment nor create any presumption, but, on the contrary, limited the finding of abandonment in certain cases. This holding is in accord with the decision in In Re: Adoption of a Female Child: Miller v. Arrington, and Arrington, 412 So.2d 1175 (Miss., 1982), in which the sole issue of abandonment was addressed.
Miller is distinguishable on the question of abandonment from this case. Furthermore, neither the Miller case, nor the opinion of the chancellor here considered desertion or speak to the effect of subsection 3(e) upon such termination of parental rights as to overcome an objection to adoption. We believe that this is a case where there has been "... some substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, ... prolonged and unreasonable absence [or] unreasonable failure to visit or communicate, ..."
Here there was certainly serious neglect and unreasonable failure to visit or communicate, as shown by the chancellor's opinion and as established by the clear and convincing proof. Let us concede there was a proper parental relationship between Roe and M.D., in all the circumstances, until M.D. was thirteen months old. Since that time there has been no reasonable effort to visit or communicate and there has been absolute neglect of M.D. by Roe. M.D. does not know Roe as a father. The parental relationship has been so far eroded by Roe's conduct that it no longer exists as far as M.D. is concerned. He thinks of the petitioner John Ainsworth as his daddy, as shown by the undisputed proof, and a fine father-son relationship exists between them.
The chancellor held that Roe's objection to the adoption should be sustained and, therefore, never reached the matter of considering the welfare of the child. He did find that the petitioners have looked after and reared the child to his present age in a proper manner. However, the statute, *421 as we view it, requires a definite adjudication that the welfare of the child will be promoted or enhanced by the proposed adoption, and the case should be remanded for a determination of that question. See In Re Yarber, 341 So.2d 108 (Miss. 1977).
In view of our holding on the question of the validity of Roe's objection to the adoption, we find it unnecessary to discuss or act on the assignment of error regarding the denial of the petition for rehearing.
This cause is reversed and remanded for consideration of the child's welfare if adopted to the petitioners, and such further action as to change of name and records as may be appropriate in the event of a decree of adoption after such consideration.
REVERSED AND REMANDED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM and HAWKINS, JJ., concur.
ROY NOBLE LEE, BOWLING and DAN M. LEE, JJ., dissent.
ROY NOBLE LEE, Justice, dissenting:
I cannot agree with the majority opinion and, therefore, dissent.
In my view, the present case, on the facts and law, measures up to Yarbrough v. Dearman, 341 So.2d 108 (Miss. 1977), and In Re: Adoption of a Female Child: Miller v. E.K. Arrington and Arrington, 412 So.2d 1175 (Miss. 1982). The principle involved is identical.
The majority bases the decision on the following parts of Mississippi Code Annotated Section 93-15-103 (Supp. 1980):
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
(a) A parent has deserted without means of identification or abandoned and made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; ...
In my opinion, Section (3)(a) does not change the established law that there must be an abandonment or desertion of a child by the natural parent before that child can be taken away from the parent and adopted by another person. The phrase, "made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year" is meaningless because as many explanations and excuses may be made to the reason for no contact within such short periods as there are broken homes.[1]
The majority opinion states that Miller, supra, is distinguishable from the case at bar because it does not consider desertion or the effect of Subsection (3)(e) of the statute. I think the terms "abandonment" and "desertion" are tweedle-dee and tweedle-dum. The result of each is the same. As in tort cases, a person who negligently fails to perform a duty (act of omission) and a person who negligently commits an act (act of commission) are both guilty of negligence which permits an injured party to recover. The terms are different but the result is the same, and for practical purposes the terms mean the same.
The chancellor, in the case sub judice, heard conflicting evidence on the questions of abandonment and desertion and found that there was no abandonment of the child. It follows that he found there was no desertion of the child. In my opinion, the chancellor was not manifestly wrong in his finding of fact and he correctly applied the law. The term "manifestly wrong" in these cases, should be extended to proof beyond reasonable doubt that there was an abandonment or desertion, before a child could be taken from a parent and given to another person.
Since the beginning of jurisprudence in this state, the law and the courts have jealously guarded the rights of parents to their children and not to have them taken away by others. This is true whether the parents be high or low, rich or poor, educated or ignorant, wise or foolish. Now is not the time to change the law or to facilitate adoptions from objecting natural parents.
*422 As was said in Yarbrough v. Dearman, supra, "In passing upon the adoption of children, the Court must first determine that one of the grounds for adoption exists, (1) abandonment or (2) moral or otherwise unfitness, and then what is for the best interest of the children." [341 So.2d at 110]. The chancellor here found there was no abandonment of the minor child.
In my opinion, the majority has gone too far and I respectfully dissent therefrom.
BOWLING and DAN M. LEE, JJ., join this dissent.
DAN M. LEE, Justice, dissenting:
I am unable to agree with the majority opinion reversing the chancellor and terminating the natural father's parental rights, and therefore respectfully dissent. A recitation of the facts is unnecessary except as to the facts upon which the majority relies to establish abandonment of the child by his natural parent.
The evidence in the case sub judice was undisputed insofar as the natural parent ceased making support payments for the child as of April 1977. The last time the natural father visited with the child occurred sometime in 1976. Although the natural father sought visitation with the child in April 1977, visitation rights were refused by the mother due to the child's illness. The mother admitted that she probably made a statement at this time to the effect that further visitation with the child would not be allowed until child support payments were made current.
The natural mother remarried in July 1977, moving into the residence of her new husband. Since this time, she has expressed her view that she desires no further contact with the natural father or his family. Although the natural father did not make efforts to locate his child after his former wife's remarriage, any attempt to do so would have been futile as evidenced by the mother's desire to sever all contact with the natural father.
The chancellor in finding that the father had not abandoned the child, relied upon Yarber v. Dearman, 341 So.2d 108 (Miss. 1977), wherein we reiterated the definition of abandonment and desertion espoused in our previous decisions as importing any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. Moreover, we held that callous indifference to the welfare of a child did not constitute abandonment or desertion so as to sever the relationship of a child and his natural father. Subsequently, in In Re: Adoption of a Female Child: Miller v. Arrington and Arrington, 412 So.2d 1175 (Miss.,1982), Miller objected to the adoption of his natural child by his former wife and her new husband. The proof in that case showed that Miller was enjoined by the divorce decree from "bothering or molesting" either Mrs. Miller or the child in any manner whatsoever. Miller never made any support payments voluntarily, but only did so when under the compulsion of contempt proceedings, including periods of incarceration. Miller had not seen the child since she was one year old.
Reversing the chancellor's findings that Miller had abandoned and deserted the child, this Court found that Mississippi Code Annotated section 93-17-7 (Supp. 1981) setting forth the criteria for termination of unfit parents' rights did not alter the previous requirement of the older statute, Mississippi Code Annotated section 1269-03 (1942) concerning abandonment and desertion. The Court further found there was no evidence of abandonment other than the constant arrearages in child support payments, some of which were explained by his inability to pay following injuries in an automobile accident. This Court simply found there was no evidence that Miller evinced a settled purpose to forego all parental duties and relinquish all parental claims to the child.
The chancellor, in the present case, made his finding of fact after having observed all the parties and witnesses following direct dictates from decisions of this Court. The majority now reverses him for following those decisions. In effect, the majority *423 held in Miller (March 31, 1982) there must be a settled purpose or intention to relinquish parental rights and now holds there does not have to be a settled purpose or intention to relinquish parental rights. In my opinion, the chancellors of this state will be left in a state of confusion by the decision today which holds contrary to our decisions in Yarber and Miller. The majority seeks to distinguish Miller; however, in my opinion, the majority has failed to do so simply because Miller is indistinguishable from the case sub judice.
Today, one out of every two and one-half marriages ends in divorce. Innocent children are caught in the midst of their parents' controversies and are often used as vehicles for their parents' hostilities toward one another long after the divorce decree becomes final. In a majority of cases, the mother will be awarded the custody and care of the children. When the mother remarries, a third party is injected into the existing hostilities between the natural parents which often leads to violence as in Yarber. A stepparent is merely an addition to a family, not a replacement for a child's natural parent. In many cases a child will have close ties to its noncustodial parent, and to deny that child and parent the privilege of companionship and love will not always be in the child's best interest.
Adoption laws were passed to provide homes for destitute, homeless and neglected children. Yet ordinary adoption laws are still applied to cases such as this one where the custodial natural parent seeks to terminate the child's relationship with its noncustodial natural parent.
Perhaps this Court in the future will find alternatives to adoption in cases such as this one where a natural parent's relationship with his child is being severed forever. One alternative would be to award the stepparent equal legal custody of the minor child with the custodial parent, thereby establishing rights of the stepparent while preserving the natural parent's relationship with the child. For a good discussion on this subject, see Aulik, Stepparent Custody: An Alternative to Stepparent Adoption, 12 UCD L.Rev. 604 (1979).
In my opinion, the forced adoption now being fostered upon the child has effectively denied his privilege of visitation with his father which is not in the child's best interest. I would therefore affirm the chancellor's findings.
BOWLING, J., joins this dissent.
NOTES
[1] Mississippi Code Annotated section 93-17-29 (1972) provides that the style of the cause recite only the names of the petitioners. For that reason the natural father is referred to by a fictitious name and the child by initials.
[2] Between the time of adoption of this law as Chapter 268, Laws of 1935 and the statute as it now exists, the words "and/or" were dropped between abandoned and deserted and the simple disjunctive "or" replaced the conjunctive-disjunctive.
[1] On conflicting evidence, the chancellor held there was no abandonment in the present case.