806 So.2d 1023 (2000)
M.L.B.
v.
S.L.J., Individually, and as Next Friend of the Minor Children, S.L.J. and M.L.J., and His Wife, J.P.J.
No. 97-CT-00929-SCT.
Supreme Court of Mississippi.
April 20, 2000.
Rehearing Denied July 25, 2000.
Danny Ray Lampley, Tupelo, Attorney for Appellant.
James W. Pannell, William R. Fortier, B. Sean Akins, Ripley, Attorneys for Appellee.
EN BANC.

ON WRIT OF CERTIORARI
BANKS, Presiding Justice, for the Court:
¶ 1. This appeal deals with termination of parental rights. The chancery court found in this case that the mother of the children in question had allowed their relationship to erode due to neglect, unreasonable absence and failure to communicate with the children and termination of the mother's parental rights was justified. The Court of Appeals, while acknowledging that the parent-child relationship in question was not a good one, found that the substantial burden of proof necessary for termination of parental rights had not been met, and it reversed and rendered. This Court granted certiorari to consider the question, and, after consideration, we find that the judgment of the Court of Appeals should be affirmed.

I.
¶ 2. In June of 1992, M.L.B. and her husband, S.L.J., were divorced after eight years of marriage, agreeing to leave their two children, S.J. and M.L.J., in S.L.J.'s custody. Additionally, M.L.B. was ordered to pay $40 a week child support beginning May 1, 1992, to maintain medical insurance on the children, and pay half of all medical bills not covered by the insurance policy. Less than three months after the divorce, S.L.J. remarried. M.L.B. remarried in October 1992. Seventeen months later, on November 15, 1993, S.L.J. and his new wife, J.P.J., filed a complaint for adoption in the Chancery Court of Benton County, seeking to terminate *1024 the parental rights of M.L.B. and to allow J.P.J. to adopt the minor children.
¶ 3. After holding hearings on August 18, November 2, and December 12, 1994, the chancery court issued an order terminating the parental rights of M.L.B. In accord with this decision, the order granted adoption of S.J. and M.L.J., who were nine and seven years of age at the time, to J.P.J.
¶ 4. S.L.J.'s witnesses testified that M.L.B. had married a physically abusive alcoholic ex-convict shortly after her divorce from S.L.J.; that M.L.B. was in arrears in her child support, which was $40 per week; that M.L.B.'s visitation with the children was not provided in specific terms but was to be decided by M.L.B. and S.L.J., but was not to take place in the presence of her new husband; that S.L.J. had allowed M.L.B. visitation at M.L.B.'s sister's house in order to prevent the children from being around her husband; that M.L.B. rarely called to speak to the children, and would at most call S.L.J. at his place of business and ask how they were; that S.L.J. rarely knew how to get in touch with M.L.B., and often her family could not find her; that M.L.B. had sent two letters to the children in September 1992 but had never sent birthday or Christmas cards to her children; that the two children had been badly behaved and were doing poorly in school while S.L.J. and M.L.B. were married; that M.L.B. screamed at the children during the marriage and was physically abusive; that they had markedly improved in all areas since S.L.J.'s marriage to J.P.J. and were regular church-goers; that the children, ages nine and seven at the time of the hearing, now looked to J.P.J. as their mother; that S.L.J. and J.P.J. had a child of their own in April 1994; that M.L.B. had called in April 1994 to see the children, and S.L.J. and J.P.J. had to decline on that occasion because they were packing to take J.P.J. to her mother's home for the birth of her baby; that after the adoption suit was filed in November 1993, M.L.B. made two payments of child support, $40 and $50; that the last time M.L.B. saw the children was in August 1994, at her sister's house, and she spent thirty minutes with them; that M.L.B. had at one time returned a gold chain to S.L.J. that he had given her, worth approximately $250, in lieu of child support. Apparently a triggering event for the subject of adoption came from the death of a friend of the children. The children began asking S.L.J. and J.P.J. what would happen to them if S.L.J. died; when told that they would be returned to M.L.B., they asked to be adopted.
¶ 5. M.L.B.'s witnesses testified that she was far from a perfect parent, but that she loved her children and had done the best she could under some very bad circumstances; that she had only gotten an automobile and two quilts in her divorce settlement; that her visitation had been more extensive than S.L.J.'s witnesses had stated; that sometimes the children called M.L.B. from her sister's house; that M.L.B. had been periodically separated from her husband but he had quit drinking and she was back with him; that she had and lost several menial jobs since her divorce and this was one reason she was behind in her child support; that she was now a certified nurse assistant and worked at a nursing home and was trying to obtain her GED and eventually become an LPN; that she had bought Christmas presents for the children in 1993 and Easter presents in 1994 but S.L.J. would not allow her to deliver the gifts to the children; that her last visitation with the children had been in October 1993; that she had tried to call the children numerous times but S.L.J. had hung up on her; that she had quit paying child support because S.L.J. *1025 would not allow her to have visitation and because she was making very little money. M.L.B. did not dispute that the children were well taken care of in their present environment, and she was not asking for custody, only stating that she loved the children and wanted to be able to visit with them and talk with them on the phone.
¶ 6. The chancery court found:
This Court adjudicates that the best interest of these children requires that the natural rights of the mother be terminated and that the Petition For Adoption be granted. The actions of the mother as recited in this opinion and as reflected by the proof and testimony presented, indicate that she has wholly and completely failed to fulfill her obligations. Also it's necessary for the adopting parties to prove their case by clear and convincing evidence. The Court finds that they have sustained the burden of proof. It's the judgment of this Court that the mother has just totally failed to sustain a relationship between her and her children. It's the judgment of this Court that the best interest of the children are promoted and enhanced by adoption.
Factors recited in Natural Mother v. Paternal Aunt to be considered in determining the child's best interest are stability of environment. As between the biological parents the father can provide that, the mother cannot. Ties between prospective adopting parents and the children. The children's grades have increased because of the interest and concern of their stepmother. The proof indicates that there is a love between the children and their stepmother. The biological mother, herself, stated that the children are better off living with their father and stepmother. The testimony is that the children love their stepmother and the testimony from the stepmother herself is that she loves the childrenjust as she loves Sylvia, the new infant, born into her union with S.L.J. The moral fitness of the parent speaks for itself. The mother had a relationship with J.B. during the time that she was married to S.L.J., their relationship continued after the divorce was granted until finally it was consummated by marriage. She would now have J.B. in her home; and, although, the mother may be convinced that he is free of his alcohol addiction, this Court has been in this business long enough to understand that one of the most difficult things for a man or woman to do is to free themselves from the addiction of alcohol or drugs. It requires continual efforts, attendance to AA facilities; and for the mate to attend similar facilities to assist the addicted one. The home, school and community record of the child. Uncontradicted testimony from uninfluenced, non-biased and unrelated parties about the life style and living conditions of the children during the time they were living with their biological mother and father, and after the divorce as they live with their father and their stepmother. Vast improvements were made.
In applying the applicable statutory factors and case law to all of the proof received during trial, this Court is convinced that the petition to adopt the children should be granted. And could this Court apply the facts of this case to the Natural Mother case, the children were once unruly, undisciplined, but now they are settled and well adjusted. They now attend church and Sunday School. They are now in the process of bonding with Sylvia. The children receive medical care regularly. They are both in school doing well. Prior to the union between their father and stepmother, as the result of the tumultuous life style of their biological mother, they *1026 were not doing too well, but they are now settled in. They've made the honor roll. The relationship between the children and others is very, very good. It appears that their stepmother, J.P.B., has done an excellent job in her role model as mother to these children. There is no deficiency in the care offered by the father or the stepmother to these children. Such being the case, as I've stated, the adoption will be granted.
¶ 7. The Court of Appeals reversed and rendered, finding that the chancellor had ruled that termination was justified under Miss.Code Ann. § 93-15-103(3)(e)(1994), that there had been a substantial erosion of the relationship between M.L.B. and her children, caused primarily by M.L.B. While agreeing that M.L.B. was hardly an ideal mother and was not entitled to be the custodial parent or have unconditional visitation, the Court of Appeals concluded that M.L.B. had not abandoned her children such that her parental rights should be terminated.

II.
¶ 8. The Court of Appeals provided the following standard of review and statutory basis for termination of parental rights:
Our standard of review on appeal is quite limited. "The chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test." Vance v. Lincoln County Dept. of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985); Veselits v. Cruthirds, 548 So.2d 1312, 1316 (Miss. 1989)). In passing upon the adoption of the children, the chancellor must first determine that one of the grounds for adoption is present: (1) desertion or abandonment or (2) moral unfitness. Natural Mother v. Paternal Aunt, 583 So.2d 614, 618 (Miss.1991) (citing In the Matter of Yarber, 341 So.2d 108, 110 (Miss.1977)). "We ask not how we would have decided the case ab initio but whether there be credible proof from which a rational trier of fact may have found abandonment by clear and convincing evidence." Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992) (citations omitted). "On the other hand, where on review it is apparent the court below has misapprehended the controlling rules of law or has acted pursuant to a substantially erroneous view of the law, we will proceed de novo and promptly reverse." Id. In termination of parental rights cases, the burden of proof in such a case is by clear and convincing evidence. Miss.Code Ann. § 93-15-109 (Rev.1994). Once the clear and convincing burden has been met, the best interest of the child is to be considered. Vance, 582 So.2d at 417. The chancellor found that it had been established by clear and convincing evidence that there existed "a substantial erosion of the relationship between ... [M.L.B.] and the minor children, ... which had been caused at least in part by [M.L.B.'s] serious neglect, abuse, prolonged and unreasonable absence or unreasonable failure to visit or communicate with her minor children, as specified by Section 93-15-103(3)(e) of the Mississippi Code...."
It is well settled that a parent's right to raise her children is of a fundamental nature, and is entitled to great protection, but that parental rights may be terminated when the welfare of the children is threatened. Vance, 582 So.2d at 417. Mississippi Code Annotated § 93-17-7 (Rev.1994) sets forth the criterion for termination of unfit parents's rights. In pertinent part the statute reads:
No infant shall be adopted to any person if either parent, after having been summoned, shall appear and object *1027 thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, being within any grounds requiring termination of parental rights as set forth in subsections (2) and (3)(a), (b), (d) or (e) of Section 93-15-103 in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the child, or children, sought to be adopted....
Miss.Code Ann. § 93-17-7.
The statute in which the chancellor relied to terminate M.L.B.'s parental rights reads in part:
(3) Grounds for termination of parental rights shall be based on one or more of the following factors:
. . . .
(e) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment;....
Miss.Code Ann. § 93-15-103(3)(e) (Rev. 1994).
M.L.B. v. S.L.J., No. 97-CA-00929-COA, slip. op. at 10-11 (Miss.Ct.App.1999).
¶ 9. The Court of Appeals relied heavily on Petit v. Holifield, 443 So.2d 874 (Miss. 1984), which is factually similar to the case at bar. Gene Petit left his wife for another woman. The Petits had two young children. The Petits were divorced in February of 1980. Mrs. Petit married John Holifield in August 1980. Gene Petit got behind in his child support and visited his children no more than five times between February 1980 and September 1981. Visitation rights were to be worked out by Gene Petit and his ex-wife. Gene had called the children on numerous occasions and had sent a birthday gift and Christmas presents. John Holifield filed a petition to adopt the children in September 1981. Mrs. Holifield suffered from Hodgkins Disease and stated that if something happened to her she did not want Gene taking the children where the youngest child was too young to remember him. The chancellor granted the adoption based on the finding that Petit had abandoned and deserted his children and that Petit was not morally fit because of his adultery.
¶ 10. This Court in Petit reversed and rendered, though it did not specify on which part of § 93-15-103(3) it relied. The Court of Appeals found that the only part of the statute which was applicable under the facts of Petit was § 93-15-103(3)(e). In reversing this Court stated:
In Ainsworth v. Natural Father, 414 So.2d 417 (Miss.1982), we reiterated the definition of "abandonment" as importing any conduct on the part of the parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child. We further went on to define the verb "desert" as foresaking one's duty as well as a breaking away from or breaking off associations with some matter involving a legal or moral obligation or some object of loyalty. We noted that abandonment has to do with the relinquishment of a right or claim whereas desertion involves an avoidance of a duty or obligation.

*1028 Mr. Petit was not allowed visitation rights under his divorce decree. Although his visits with the children are very infrequent, he has not so totally shown that he wishes to "relinquish all parental claims to the children" constituting an abandonment of said children. It is true as noted by the chancellor that the phone calls made to the children's residence could have been to speak to Mr. or Mrs. Holifield and not to the children; however, in the same light the calls could have just as easily been made for the purpose of checking on the children's welfare. Because of the young age of these children and these infrequent visits Mr. Petit most likely does not have a close or father-like relationship with either child especially Dustin who was a small infant at the time of the divorce. Even though his attempts, feeble as they are, will not produce the relationship Mr. Petit seems to desire as the natural father, we cannot say that this alone is sufficient to constitute abandonment under our statutory and case law.
In applying the definition of desertion as found in Ainsworth, supra, Mr. Petit has clearly not fulfilled his obligation of paying child support. However, In re Adoption of Female Child, 412 So.2d 1175 (Miss.1982), we found that failure alone to pay child support is insufficient to constitute abandonment. The natural father in that case was able to offer proof as to his inability to make the child support payments. As in the matter now before us, Mr. Petit, although able to support himself and his present wife, offered sufficient evidence to the court as to his inability to purge himself of the contempt charges against him. Based on this finding by the chancellor, we do not find either desertion or abandonment as a result of Mr. Petit's failure to pay his child support.
The chancellor found Mr. Petit unfit because of his adulterous relationship. In custody cases we have held that the fact that a custodial parent has cohabitated with a person who later became that parent's spouse to be insufficient to constitute a material change in circumstances requiring a change in custody. See Kavanaugh v. Carraway, 435 So.2d 697 (Miss.1983). This same rule applies with equal force in adoption cases. The mere fact that a natural parent has had a prior adulterous relationship is insufficient to warrant a finding that the parent is unfit under our statutes whereby his parental rights may be severed. Mr. Petit did marry Pam Savelle and there was no evidence of continuing promiscuity.
Viewing the evidence before us in light of the above authorities, we are of the opinion that the conduct of Mr. Petit does not evince a settled purpose to forego all parental rights and relinquish all parental claim to these children. He does, however, come close and is "teetering" on the brink insofar as his duty to support the children is concerned. In fact, if the totality of the circumstances continue without improvement over a substantial period of time in the future, a court would be justified in decreeing an adoption over his protest. We are unable to say that the chancellor was manifestly wrong in holding that Mr. Petit was unable to support these children at the time of the hearing, although we find that question to be extremely close. Mr. Petit needs to "tighten his belt" and live a little less comfortably and begin contributing the court-ordered child support for these children. He is hardly an ideal parent and perhaps not even the best parent for these children as between himself and Mr. Holifield, but under the evidence that we *1029 have before us, we are unable to say that the Holifields have proven by clear and convincing evidence that Mr. Petit has abandoned or deserted the children or that he is unfit within the meaning of the law.
Petit, 443 So.2d at 878-79.
¶ 11. S.L.J. and J.P.J. do not allege that the Court of Appeals relied on the wrong law, just that it erred in reversing the chancery court. They cite In re Adoption of J.J.G., 736 So.2d 1037, 1038 (Miss.1999), where this Court stated: "The best interest of the child is a polestar consideration in the granting of any adoption." It is a consideration, but this Court has never allowed termination of parental rights only because others may be better parents.
¶ 12. We find that the chancery court's judgment was not supported by clear and convincing evidence, and that the Court of Appeals properly reversed and rendered. The judgment of the Court of Appeals is affirmed.
¶ 13. AFFIRMED.
PRATHER, C.J., PITTMAN, P.J., McRAE, WALLER AND COBB, JJ., CONCUR. MILLS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J. DIAZ, J., NOT PARTICIPATING.
MILLS, Justice, dissenting:
¶ 14. I disagree with the majority's conclusion that there is not clear and convincing evidence to support the termination of M.L.B.'s parental rights. A thorough reading of the record demonstrates that the chancellor considered all of the proper and requisite legal factors and made a correct decision. Further, we must remember the standard under which we review a chancellor's findings. This Court will not disturb findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or applied an erroneous legal standard. Tinnin v. First United Bank, 570 So.2d 1193, 1194 (Miss. 1990). Where there is substantial evidence to support the chancellor's findings, we are without the authority to disturb his conclusions, although this Court might have found otherwise as an original matter. In re Estate of Harris, 539 So.2d 1040, 1043 (Miss.1989). I assert that the chancellor did not commit manifest error or apply an erroneous legal standard. The record evinces clear and convincing evidence that M.L.B. allowed her relationship with her children to erode substantially. Termination of her parental rights under Miss.Code Ann. § 93-15-103(3)(e)(1994) was warranted. The majority, of course, finds otherwise, relying heavily on our decision in Petit v. Holifield, 443 So.2d 874 (Miss.1984). In Petit, the mother of two minor children and her new husband petitioned to have the new husband adopt the children. Id. at 875. The petition alleged that Gene Petit, the children's natural father, had abandoned or deserted his children and was otherwise unfit to rear or train them. Id. It was established that Mr. Petit had visited his children only five times during an eighteen month period but called his children on numerous occasions and sent birthday and Christmas gifts. Id. at 876. It is also important to note that Mr. Petit's occupation required him to be away from home a substantial amount of time and that he resided outside of the state for all but four months since his divorce from the children's mother. Id. There was also testimony suggesting that Mr. Petit had indicated to his children where he resided at the time by sending his older child two self-addressed envelopes. Id. The chancellor in Petit expressly based his finding that Mr. Petit was morally unfit to be a father to his children on the fact that he had openly lived in adultery with his present wife and that the new *1030 husband was willing to take the responsibility of raising the children if something happened to their natural mother. Id. This Court rightly found that the chancellor erred in basing his decision, even in part, on Mr. Petit's adulterous relationship: "The chancellor found Mr. Petit unfit because of his adulterous relationship. In custody cases we have held that the fact that a custodial parent has cohabitated with a person who later became that parent's spouse to be insufficient to constitute a material change in circumstances requiring a change in custody. This same rule applies with equal force in adoption cases." Id. at 878 (citations ommitted). This Court went on to conclude that Mr. Petit's actions or inaction as a parent did not demonstrate abandonment, desertion or moral unfitness. Id. However, it is abundantly clear that we reversed the chancellor's finding primarily because of his error in basing Mr. Petit's moral unfitness on his adulterous relationship. Further, this Court stated that Mr. Peitit "does ... come close and is teetering on the brink" of warranting a termination of his parental rights. Id. Clearly, if Mr. Petit was teetering on the brink then M.L.B. has slipped over the edge.
¶ 15. The record contains clear and convincing evidence that M.L.B abandoned, deserted or allowed her relationship to erode substantially with her children. The 1992 divorce decree stipulated that M.L.B. would have reasonable visitation rights but in no event would M.L.B. exercise her visitation rights in the presence of J.B., her boyfriend who was a known drunkard and reputedly violent person, who M.L.B. stated had beaten her and spent time in the penitentiary for assaulting a police officer. Nevertheless, M.L.B. continued to date this man and eventually married him even with the knowledge that he served as an impediment to her maintaining a meaningful relationship with her children. Testimony revealed that M.L.B disappeared for a period of time and that even her family did not know where she was. Further, there was testimony that M.L.B. did not visit or see her children for a period of 14 months, though this was disputed. At any rate, M.L.B. exercised her visitation rights very infrequently, spending only short periods of time with them when she did visit, evincing a general apathy toward her children. Further, the children's father testified that the children were "balls of nerves" after seeing M.L.B. M.L.B.'s attempts to contact her children by phone curiously were usually made to their father's business when she surely knew that the children were in school. M.L.B. claimed that for a while she did not know the home phone number. M.L.B. never sent her children birthday or Christmas cards. There was testimony indicating that M.L.B attempted to give the children Christmas presents but that she was unsuccessful. At one point, by M.L.B's own admission she returned some Christmas presents that she had originally bought for the children. Finally, there was evidence that the children referred to their father's second wife with maternal names.
¶ 16. The chancellor found that M.L.B. had allowed her relationship with her children to erode substantially and, accordingly, that her parental rights should be terminated under Miss.Code Ann. § 93-15-103(3)(e)(1994). I do not think that the chancellor's determination can be said to be an abuse of discretion or manifest error. Therefore, I must respectfully dissent.
SMITH, J., JOINS THIS OPINION.