761 So.2d 956 (2000)
N.E. and R.H., Appellants,
v.
L. H., Jr., L.H. and L.T., Appellees.
No. 1998-CA-01242-COA.
Court of Appeals of Mississippi.
June 13, 2000.
*958 Mildred J. Lesure, Sandra Jaribu Hill, Attorneys for Appellants.
Helen Kennedy Robinson, Attorney for Appellees.
BEFORE SOUTHWICK, P.J., LEE, MOORE, AND THOMAS, JJ.
*959 THOMAS, J., for the Court:
¶ 1. This is a termination of parental rights and adoption case. N.E., the maternal grandmother, and R.H., the natural mother, appeal the decision of the Marshall County Chancery Court terminating the parental rights of the natural mother, removing the minor child, L.E.H., from the legal custody of the maternal grandmother, and granting the appellees's, Mr. and Mrs. L.H., Jr., petition to adopt the minor child. On appeal, the maternal grandmother and natural mother raise the following assignments of error:
I. THE TRIAL COURT'S DECISION TO TERMINATE THE PARENTAL RIGHTS OF R.H. WAS NOT SUPPORTED BY EVIDENCE SUFFICIENT TO MEET THE REQUIRED STANDARD OF PROOF, WHICH IS CLEAR AND CONVINCING.
II. THE TRIAL COURT'S FINDING THAT R.H. HAD ABANDONED THE MINOR CHILD WAS NOT SUPPORTED BY THE EVIDENCE IN THIS CASE.
III. THE TRIAL COURT ERRED IN FINDING THAT THE BEST INTERESTS OF THE MINOR CHILD WAS TO BE ADOPTED BY R.H. AND L.H.
IV. THE TRIAL COURT ERRED IN FINDING R.H.'S "PERCEIVED DISABILITY" AS A FACTOR HE CONSIDERED IN TERMINATING THE PARENTAL RIGHTS OF R.H.
V. THE GUARDIAN AD LITEM FAILED IN HER DUTY TO INVESTIGATE AND DETERMINE WHAT WAS THE BEST INTEREST OF THE MINOR CHILD.
¶ 2. Finding reversible error, we reverse and render in part, and reverse and remand with instructions.

FACTS
¶ 3. L.E.H., the minor child and the subject of the proceedings, was born August 7, 1988, and was ten years of age at the time of the lower court's decree. At the time of his birth, L.E.H. and his mother, R.H., were living with the alleged father, L.T., in his sister's home. Shortly after the child's birth, the Department of Human Services removed the child from the care and custody of his mother on October 2, 1988 and placed him with the appellees, Mr. and Mrs. L.H., Jr., as temporary foster parents. At trial, the evidence presented as to why DHS removed the child from his mother in October of 1988 indicated "medical neglect." The DHS supervisor in charge of the child's case testified that "the mother was not meeting his medical needs and his appointments," and that the reasons for removal did not extend to any other kinds of neglect. Malnourishment was the principal concern. In contrast, the guardian ad litem testified, as indicated in her report, that the "medical reports" taken at the time of the child's birth state that the child was born prematurely and that both parents were drug abusers. However, DHS provided no testimony supportive of the assertion that the parents were drug abusers. Furthermore, the alleged father, when asked whether he had any personal knowledge, or otherwise, of drug abuse on the part of the mother, R.H., the alleged father stated that he did not. The alleged father joined the appellees in their petition for adoption and further voluntarily waived his parental rights to the minor child.
¶ 4. Following the placement of the minor child with the appellees in October of 1988, the minor child was removed from their custody after DHS was able to locate a suitable relative with which to place the child. On January 3, 1989, DHS placed the minor child with his maternal grandmother. DHS testimony revealed that as a departmental policy, placement of a child with a suitable relative was given priority over placing a child with a third party. However, if a suitable relative is not available, then placement with a suitable third party is then considered. This occurred shortly after the child was placed with his maternal grandmother on January 3, 1989. *960 On February 2, 1989, the child was removed from the custody of his maternal grandmother and again placed in the care of the appellees after it was revealed that the home in which the maternal grandmother lived had inadequate heating facilities and shelter. The child stayed with the appellees from February 2, 1989 until September 4, 1990, at which time it was deemed that the maternal grandmother's living conditions had substantially improved after she moved from the previously inadequate housing into the home of her mother, the child's maternal great-grandmother. The child resided with his maternal grandmother from September 4, 1990 until June 16, 1998, when at such time the child was again placed with the appellees, following the lower court's decree terminating the natural mother's parental rights and award of adoption.
¶ 5. The appellees continued to maintain a relationship with the child between September 4, 1990 and the year 1997. During this time the appellees visited with the child on a routine basis at the home of his maternal great-grandmother, provided him with personal items, and even took him on some overnight trips.
¶ 6. In terminating the natural mother's parental rights and removing the previously awarded legal custody of the maternal grandmother in favor of the petition for adoption by the appellees, the chancellor made, in part, the following conclusions in the final decree of adoption:
The minor child was taken from the mother by the Marshall County Department of Human Services in 1988 because she was not meeting the child's medical needs. The mother would not enter into a service agreement with the department; she is still unstable; she has abandoned the minor child; she has not supported the minor child and has shown no regard for his welfare; and she is mentally unable to care for the child. The facts reveal that [R.H's] parental rights should be terminated. Custody of the minor child was placed with [N.E.], the maternal grandmother. The grandmother is not mentally able to care for the child and the best interest of the minor child will be served by a change in his current status.
¶ 7. From this decree the child's mother and his maternal grandmother appeal to this Court. We now turn to our familiar standard of review and the issues presented.

ANALYSIS
¶ 8. We begin by restating our well established standard of review employed in addressing matters such as are present in the case before us. "The chancellor's findings of fact are viewed under the manifest error/substantial credible evidence test." Vance v. Lincoln County Dep't. of Pub. Welfare, 582 So.2d 414, 417 (Miss.1991) (citing Bryant v. Cameron, 473 So.2d 174, 179 (Miss.1985); Veselits v. Cruthirds, 548 So.2d 1312, 1316 (Miss. 1989)). Under this standard, we accord wide latitude and discretion to our chancellors and their courts because of the benefits present from having heard the testimony and evidence while observing the witnesses and their demeanor. Ainsworth v. Natural Father, 414 So.2d 417, 420 (Miss.1982). However, of equal importance in our application of this standard is our duty to abide by the following, that being "where on review it is apparent the court below has misapprehended the controlling rules of law or has acted pursuant to a substantially erroneous view of the law, we will proceed de novo and promptly reverse." Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992).
¶ 9. At issue in this case are two equally important aspects of family law, the termination of a parent's parental rights and the grant of a petition for adoption. While it is well settled that a parent's right to raise his/her children is of a fundamental nature, and is entitled to great protection, those rights may nevertheless be terminated when the welfare of *961 the children is threatened. Vance, 582 So.2d at 417; Miss.Code Ann. §§ 93-15-103, 93-17-7 (Rev.1994). On the other hand, "[t]he right to adopt a child or children did not exist at common law and was first conferred by statute in this State under section 525, Code of 1871...." Mayfield v. Braund, 217 Miss. 514, 64 So.2d 713, 714-15 (1953). The original statutory scheme has naturally evolved into our present code, and reasonably so, our supreme court has "construe[d] the adoption statutes as conferring a privilege rather than a right of adoption." Martin v. Putnam, 427 So.2d 1373, 1377 (Miss. 1983); Eggleston v. Landrum, 210 Miss. 645, 50 So.2d 364 (1951).
¶ 10. When resolving such matters we are mindful of the rationale used in Mayfield. While we recognize that the statutory scheme for the adoption of children and the termination of a parent's parental rights has evolved in greater specificity from that which was present in Mayfield, we nevertheless find solitude in our Supreme Court's reasoning when addressing these matters:
Thus it will be seen that the Legislature of this State in providing the statutory method for the adoption of a child or children has not empowered any court to adopt unto others a child or children where the parent `shall appear and object thereto before the making of a decree of adoption', unless it shall be made to appear, from evidence touching such matters, that (1) the parent so objecting has abandoned or deserted such child or children, or (2) is mentally or morally unfit to rear and train the same, but that `in either of which cases the adoption may be decreed notwithstanding the objection of such parent,' provided, of course, as stated in the statute, the welfare of the child or children sought to be adopted would be best served by allowing the petitioners then before the court to do so. It is therefore made clear that the court does not reach the issue of what is to the best welfare of the child or children sought to be adopted until it shall first appear from the evidence that the parent so objecting has abandoned or deserted the child or children, or is mentally or morally unfit to rear and train it or them, when the contest is between a natural parent and third persons.
Mayfield, 64 So.2d at 715-16.
¶ 11. In termination of parental rights cases, the petitioner must prove that the natural parent either abandoned or deserted the child or is mentally or morally or otherwise unfit to rear or train the minor child. Petit v. Holifield, 443 So.2d 874, 877 (Miss.1984). "The burden of proof is on the party seeking to terminate the parents' rights." Lauderdale County Dep't. of Human Services v. T.H.G. and L.D.G., 614 So.2d 377, 385 (Miss.1992) (citing In Interest of T.T., 427 So.2d 1382, 1384 (Miss.1983)). The burden of proving that a parent's parental rights should be terminated must be met under the "clear and convincing evidence" standard. Miss.Code Ann. § 93-15-109 (Rev. 1994). Once the "clear and convincing evidence" standard of proof has been met, the best interest of the child is to be considered. Vance, 582 So.2d at 417; Petit, 443 So.2d at 877.
¶ 12. When considering the best interest of the child, Mississippi law creates the "presumption that the best interest of the child will be served by remaining in the custody of his natural parents." Lauderdale County Dep't. of Human Services, 614 So.2d at 385; see also Matter of Marriage of Smith, 555 So.2d 73 (Miss. 1989); Keely v. Keely, 495 So.2d 452 (Miss. 1986); Rodgers v. Rodgers, 274 So.2d 671 (Miss.1973). In addition Miss.Code Ann. § 93-15-103(4) (Supp.1999) provides that:
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the Department of Human Services should be considered as alternatives to the termination of parental rights, and these alternatives should *962 be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
¶ 13. Prior to granting a petition for adoption, the chancellor must make the determination, as supported by the evidence presented under the "clear and convincing evidence" standard, that one of the grounds for the adoption is present: (1) desertion or abandonment or (2) moral unfitness. Natural Mother v. Paternal Aunt, 583 So.2d 614, 618 (Miss.1991) (citing In the Matter of Yarber, 341 So.2d 108, 110 (Miss.1977)). Additional statutory grounds for terminating a parent's parental rights as factors to justify an adoption are found in Miss.Code Ann. § 93-15-103(1), (3) (Rev.1994) and include the general danger to the child's welfare, abusive incidents by the parent/s, failure of the parent/s to implement or follow a service agreement, ongoing behavior on the part of the parent/s which makes it impossible to return the child to their custody, and extreme and deep-seated antipathy by the child toward the parent/s or some other substantial erosion.
¶ 14. We acknowledge that the appellants in this case have raised five separate issues on appeal, each of which addresses a central issue, that being whether the chancellor erred in his findings of fact and conclusions of law. Likewise, from the outset the appellees have failed to file any brief in response to this appeal. We further note that, "[t]he failure [of an appellee] to file a brief is tantamount to a confession of error ... and ordinarily would be accepted as such and the judgment of the court below would be reversed." Green v. Green, 317 So.2d 392, 393 (Miss.1975) (citing Transcontinental Gas Pipe Line Corp. v. Rogers, 284 So.2d 304 (Miss.1973)). "Automatic reversal is not required where appellee fails to file a brief." Selman v. Selman, 722 So.2d 547, 551 (Miss.1998). Furthermore, generally "this Court is not obligated to look to the record to find a way to avoid the force of the appellant's argument." Id. (citing Dethlefs v. Beau Maison Dev. Corp., 458 So.2d 714, 717 (Miss.1984)). However, when matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, this Court will "reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee." Allred v. Allred, 735 So.2d 1064 (¶ 9) (Miss.Ct.App.1999); see also Barber v. Barber, 608 So.2d 1338, 1340 (Miss.1992) (holding that despite our ordinary practice of taking issues as confessed when a party fails to file a brief; in matters of child custody and support, practice is to make a special effort to review the record and the merits of the issues raised).
¶ 15. As previously stated, parental rights are of a fundamental nature and are entitled to great protection; however, those rights are naturally subject to termination once it appears that the minor child's welfare is in danger. Vance, 582 So.2d at 417. Under Mississippi law, there are specific statutory criteria for the termination of a parent's parental rights when a parent objects to a petition for adoption. Mississippi Code Annotated § 93-17-7 (Rev.1994) sets forth this criterion and it reads in pertinent part as follows:
No infant shall be adopted to any person if either parent, after having been summoned, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, being within any grounds requiring termination of parental rights as set forth in subsections (2) and (3)(a), (b), (d) or (e) of Section 93-15-103 in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the *963 welfare of the child, or children, sought to be adopted....
Miss.Code Ann. § 93-17-7 (Rev.1994).
¶ 16. In terminating the natural mother's parental rights and granting the appellee's petition for adoption of the minor child, the lower court made specific findings and stated specific grounds. We have previously stated those findings.
¶ 17. The statute on which the chancellor relied to terminate the natural mother's parental rights reads in part:
(a) A parent has deserted without means of identification or abandoned and made no contact with a child under the age of three (3) for six (6) months or a child three (3) years of age or older for a period of one (1) year; or
* * *
(c) When the child has been in the care and custody of a licensed child caring agency for at least one (1) year, that agency has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(d) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent's care and custody:
(i) Because the parent has a diagnosable condition unlikely to change within a reasonable time such as alcohol or drug addiction, severe mental deficiencies or mental illness, or extreme physical incapacitation, which condition makes the parent unable to assume minimally, acceptable care of the child; or
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or
Miss.Code Ann. § 93-15-103 (Rev.1994) (emphasis added).
¶ 18. The chancellor concluded that the minor child's natural mother had "abandoned the minor child," as part of his decision to terminate her parental rights and grant the petition for adoption. Our Supreme Court has defined abandonment "as importing any conduct on the part of the parent which evinces a settled purpose to forego all duties and relinquish all parental claims to the child." Petit, 443 So.2d at 878 (citing Ainsworth, 414 So.2d at 417). Such conduct may result from a single decision at a particular point in time or from multiple decisions concerning the child's welfare which spans a period of time and evinces a pattern by the parent to relinquish their parental claims to the child. Ethredge v. Yawn, 605 So.2d 761, 764 (Miss.1992). The test is an objective one and covers the "totality of the circumstances, be they single or multiple." Id.; see Bryant v. Cameron, 473 So.2d 174, 178-79 (Miss.1985); Petit, 443 So.2d at 878; Ainsworth, 414 So.2d at 417.
¶ 19. Our review of the record has left us troubled by the lack of supporting evidence on the ground of abandonment. In addition to the lower court's finding of abandonment, the court also reached the conclusion that the natural mother, "has not supported the minor child and has shown no regard for his welfare." While it is clear that the natural mother is far from an ideal parent and likewise has been far from productive in solidifying what should be termed as a normal parental relationship between herself and the minor child, the evidence nevertheless fails to support the chancellor's findings and conclusions under the "clear and convincing evidence" standard.
¶ 20. We note that the natural mother never testified, either as a witness called *964 by Mr. and Mrs. L.H. or of her own volition. All indications do reveal that she was present during the proceedings and available to testify. We are reminded that the burden of proving abandonment remains in the hands of the proponents. What is present in the record, however, is the guardian ad litem's report and the testimonies provided by the witnesses. However, despite the report and the testimony of the various witnesses, there is a complete absence of supporting evidence which would warrant a finding of "abandonment" under the "clear and convincing evidence" standard. The evidence, either supporting the ground or contradicting it, can only be termed as sparse at best.
¶ 21. No evidence, either pro or con, was presented concerning any parental contributions she has made to the rearing of the child either in the form of monetary support or in the form of basic nurturance. Simply put, there were no specific questions put to the witnesses on the ground of abandonment. The guardian ad litem's report, concerning statements made by the child's principal, reveals that the child "would be agitated at school whenever he had been around his mother." The report further reads that the mother "indicated that she and her boyfriend would take [the child] to live with them if necessary." These statements were, from our review, the extent of the evidence contained in the guardian ad litem's report touching on the issue of "abandonment." Both statements hardly reveal conduct on the part of the parent to forgo all parental duties and establish the ground of "abandonment." To the contrary, the report indicates that the mother was at least present, albeit sporadically, with the child as indicated in the principal's statements to the guardian ad litem and that the mother expressed some interest in having the child return to live with her. Furthermore, additional testimony by friends, family members, and social workers fails to provide the needed burden of proof that the mother has engaged in conduct supportive of the chancellor's finding that she had in fact abandoned the child.
¶ 22. Without supporting evidence, and in light of the "clear and convincing evidence" standard that controls this specific finding, the ground of "abandonment" simply cannot be allowed to stand. We would be remiss in our duty to hold otherwise given the sparse evidence presented.
¶ 23. The lower court further found the natural mother to be "mentally unable to care for the child," and based his decision, in part, to terminate her parental rights on this ground. As was the case in the previously discussed ground of "abandonment," the evidence presented in the instant ground is completely unsupportive of such a finding. Our full review of the record reveals a complete and total absence of any substantive evidence supporting the conclusion that the natural mother, R.H., suffers from any mental short comings sufficient in degree to warrant a termination of her parental rights on this ground.
¶ 24. The only testimony concerning her mental status stems from the cross-examination of one of the social workers involved in the case. During cross-examination the following inquiry was made with regard to the Department of Human Services intervention between 1988 and 1992; in pertinent part it reads as follows:
Q. And is your policy to try every other thing other than terminate parental right of a parent?
A. Yes.
Q. Now, as to R.H., she has some mental difficulty as well, does she not?
A. Yes.
Q. Would thatso she has some problems to start with, right?
A. That's correct.
Q. The department recognized that?
A. Yes.
Q. Was that a reason to try not to terminate her parental rights? One of the reasons?

*965 A. Because we went with relative placement, that's why we didn't do a T.P.R.
¶ 25. This is the extent of any inquiry into the natural mother's mental status. No further evidence was presented by either lay person or expert witness. The record is likewise devoid of any medical evidence concerning the same, yet the chancellor made the following comment in the court's bench opinion following the hearing:
[T]he Court has had an opportunity to observe her [R.H.] in the courtroom, and it is obvious to the Court that R.H. would be severely limited to rear and train L.E.H.... Having observed her, I think that her lack of interest in L.E.H. stems from her mental shortcomings. The problem is that those very mental shortcomings which free her from any volitional responsibility for her lack of interest with respect to L.E.H. are themselves grounds for permitting an adoption over the objection of a parent.
¶ 26. The court's observation of the mother in the courtroom is, as was stated, the only support for the court's conclusion. Without competent lay or medical evidence establishing a mental deficiency sufficient to warrant a termination of parental rights of the ground of "severe mental deficiencies or mental illness," this finding was made in error. Merely observing a parent's demeanor while she sits idle and silent in the audience, without having testified, will not support a finding that she is mentally deficient, or otherwise, when addressing whether that her parental rights should be terminated on mental grounds.
¶ 27. The remaining grounds, in light of our disposition of this issue, fare no better in establishing that the natural mother's parental rights should be terminated. The lower court also found that the natural mother's parental rights should be terminated due to her failure to enter into a service agreement with the department and that she was still unstable. The testimony concerning the natural mother's, "unstable" living status stems from her living status between 1988 and 1992 and speaks of practically nothing in regard to her most recent living status. Without a current reference as to her present residence and status, the testimony presented can only be described as too far removed in time to support a finding that she is still "unstable" so as not to be able to enter into a service agreement.
¶ 28. Having reached this conclusion, we now turn to that part of the decree pertaining to the adoption. We begin our analysis with our previous disposition of the termination of parental rights issue in mind and with the following language:
"A fundamental purpose and major reason for the existence of a chancery court is to fulfill society's function of protecting children."; Davis v. Davis, 194 Miss. 343, 12 So.2d 435 (1943). How much more important, when not simply some property interest, but the entire future of a child is involved that the chancellor proceed deliberately and only after assuring himself that all facts needed for the child's best interest are brought to his attention. As we stated in Martin v. Putnam, 427 So.2d 1373, 1377 (Miss. 1983), "adoptions are final, hardly subject to review on changed circumstances," and "the best interest of the child is paramount." Owens, by Mosley v. Huffman, 481 So.2d 231 (Miss.1985), taught us the misery and wretchedness which can be caused by precipitate or hasty court orders dealing with custody and parental rights of a child, a lesson we should never forget. Because this Court on appeal, just as the chancellor in a hearing, is the superior guardian for a person under disability, we are constrained to make these observations rather than remain silent, which could convey an impression of tacit approval.
Matter of Adoption of a Minor, 558 So.2d 854, 858 (Miss.1990) (holding that when *966 matters before the chancery court concern the well being of a minor child and turn on his best interest, this Court will not remain silent on said matters not brought before or addressed by the lower court). We are likewise constrained to make observations beneficial to resolving the present matter in a manner which seeks to protect the rights of all interested parties while remaining steadfast in our paramount consideration, that being what would be in the best interest of the minor child.
¶ 29. The core of the errors committed in this case relates to the lack of supporting evidence. We do not doubt that the lower court had the best interest of the minor child in mind in rendering its decision. However, given our holding that the lower court's decree to terminate the parental rights of R.H. cannot stand, we must likewise reverse that portion of the decree which granted the adoption. However, further inquiry regarding the custody arrangements of this child by the lower court is appropriate.
¶ 30. All indications in this matter reveal that the appellees are fine upstanding people who have demonstrated an unqualified interest in the well being and future of the minor child. It would appear that they have made and would continue to make ideal adoptive parents. However, as previously stated our adoption statutes confer the privilege of adoption rather than the right, Eggleston, 50 So.2d at 364, and just as was held in Martin v. Putnam, 427 So.2d at 1377, the excellent character of the adoptive parents does not create "an absolute unqualified right to adopt ... over the objection of ... close natural kindred." Likewise, however, Mississippi law does not provide close natural kindred any greater right than that of a qualified but non-related third party when the minor child's best interest is at issue. The chancery court does, however, have at its disposal the provisions set forth in the termination of parental rights statutes concerning alternatives:
Legal custody and guardianship by persons other than the parent as well as other permanent alternatives which end the supervision by the department of public welfare should be considered as alternatives to the termination of parental rights, and these alternatives should be selected when, in the best interest of the child, parental contacts are desirable and it is possible to secure such placement without termination of parental rights.
Miss.Code Ann. § 93-15-103(4) (Rev.1994). The difficulty with this case is that what is in the best interest of the minor child seems to have been clouded by the fact that one of the parties, while not necessarily the better of the two, would seem to be in a greater financial position than the other and have a more conducive family environment based in part on their ability to maintain a higher standard of living.
¶ 31. On remand the lower court should bear in mind the special medical and learning needs of the minor child when passing on its decision. The evidence presented at trial, as reflected in the guardian ad litem's report and the various testimonies, indicates that the child suffers from varying behavioral disorders. Furthermore, he is a special education student and clearly has special needs. This should play a role in determining with whom the minor child should be placed.
¶ 32. We are also reminded that the guardian ad litem's report and testimony reflected concern for the child's physical well being while residing with his maternal grandmother in the home of the maternal great grandmother. However, in all instances the investigations made by DHS resulted in the file's closure for lack of substantiating evidence. Additional inquiry into this particular concern may or may not be warranted. Accordingly, we leave it to the lower court's discretion.
¶ 33. Finally, with respect to the lower court's finding that the maternal grandmother was "not mentally able to *967 care for the child and the best interest of the minor child will be served by a change in his current status," we are compelled to comment that just as was the case with regard to the natural mother's mental status, we could find no supporting evidence on this finding. While the maternal grandmother has been described as "mentally slow," "retarded," and "lazy," which we note were all cursory statements and characterizations made by lay witnesses, the record is completely devoid of any competent lay or medical evidence supporting this finding. In contrast, DHS representatives testified that the maternal grandmother despite her apparent "mental shortcomings" was not handicapped enough to prevent her caring for the minor child and that she was fully capable of providing minimal care, which we note was testified to as meeting the department's standards. Additional inquiry and findings on this matter may also be necessary as well.
¶ 34. In conclusion, we would remind the lower court on remand in its consideration of the alternative's provision previously mentioned that any decision reached with respect to the placement of the minor child should be soundly supported by the facts of the case, keeping in mind what is in the best interest of the minor child, when making its findings of fact and conclusions of law. Further inquiry and additional investigation into the child's special needs, living conditions, family environments, and particular circumstances affecting the two parties as pertains to the best interest of the minor child on remand would greatly benefit the lower court in rendering a decision.
¶ 35. THE JUDGMENT OF THE MARSHALL COUNTY CHANCERY COURT IS REVERSED AND REMANDED IN PART AND REVERSED AND RENDERED IN PART. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, AND PAYNE, JJ., CONCUR. MOORE, J., NOT PARTICIPATING.